## THE LOUISIANA.

1. A vessel drifting from her moorings and striking against another vessel aground on a bar out of the channel or course of navigation will be liable for damage done to the vessel aground, unless the drifting vessel can show affirmatively that the drifting was the result of inevitable accident, or of a *vis major*, which human skill and precaution could not have prevented.
2. The fact that a vessel on arriving at a wharf is moored in a way which, in reference to the state of the tide and wind at that time, is proper, and that in *this* position she is made as fast as she can be, is not an excuse for her breaking away on a change of tide and wind, if ordinary nautical skill would have suggested that such a change would produce different and reversed conditions of risk.

DURING the Southern rebellion, the Louisiana, a large

---

* The Thomyris, Edwards, 17; The Maria, 5 Robinson, 365; The Maria, 6 Id. 201; The Charlotte Soph'a, Id. 204, note; The William, 5 Id. 385.

steamer, loaded with sick and wounded soldiers from our army in the South, and bound for Philadelphia, stopped at Fortress Monroe; her purpose in going there having been the twofold one of landing certain of the soldiers who were too sick to proceed on their course, and of taking in supplies of coal.   At this time, on a place in Hampton Roads known as Hampton Bar, was a steamer (c) called the Flushing, lying aground. (See map at p. 167.)   She had been there seventy-two days, unsuccessful efforts only having been made by her owners to float her.   The spot where the vessel lay was one that had been selected for the location of a buoy to mark the bar and warn vessels off, and the Flushing had gone aground because the buoy had been carried away.   Having lain in this place one hundred and thirty-three days she was finally abandoned by her owners, and was then raised by the wreck-masters.   Under orders of the government, in whose service she was, the Louisiana proceeded to a wharf (A), called the old wharf; there being a little below another and much better one (B), called the new one.   This old wharf was a narrow projecting pier, having at its extremity toward the roads a widening; the whole being somewhat in the shape of a T; but even at its front the wharf was but eighty-two feet wide.   The steamer laid and fastened herself in the only way in which vessels could lay and fasten themselves to this wharf; that is to say, along its front.   The Louisiana being, however, a long vessel, two hundred and seventy-five feet long, a small part of her, less in fact than one-third, was capable of being placed in juxtaposition to the wharf.   More-over, as soldiers were to be landed and coal taken in at the same time, it was apparently necessary to have two gang-ways in operation at once; and, as the after-gangway could not be used in consequence of the narrowness of the front of the wharf, both gangways were rigged forward.   *This threw the stern part of the boat nearly one hundred and fifty feet distant from the nearest point of the wharf.*   In addition, owing to the extent to which the wharf ran out into the sea, it was not practicable to fasten the vessel by lines, which should run from her *extremities* and at *right angles* to them to the *shore.*

All that could be done was to fasten her towards her bow (where she lay in juxtaposition to the wharf) by lines running at right angles from her to posts, &c., on the wharf; while from the extremities, and more especially the stern, lines ran to fastenings on the wharf also. These stern-lines, running transversely, operated of course much more to steady the boat than actually to hold her. The diagram, in which from necessity the top of the page is made to represent the east, will elucidate the matter.

In the morning, when the Louisiana arrived at the old wharf, the tide was ebb; that is to say, was coming *from* the west; swinging round the land somewhat to the northeast. On the other hand, the wind, at this time quite gentle, was from the northeast. Tide and wind, in their action on the boat's fastenings, thus counteracted each other. The vessel was placed with her bow against the tide; that is to say, to the west. She put out three lines, one at the stern and two forward; these being sufficient at this time to hold her. Later in the day the tide changed from ebb to flood; that is, it ran west, or somewhat round the land from the northeast, and the wind rose; coming still from the northeast; tide and wind now acting of course in one direction. Shortly before this time the captain, who was about to leave the boat to go and see the surgeons of the fort in regard to the sick and wounded soldiers on his steamer, gave the boat into the mate's charge. He and the two mates conversed, however, previously on the subject of the fastenings. They "did not anticipate the breaking away of the vessel, and thought the lines sufficient to hold her;" though the captain told the first mate that if he thought it necessary he could put more fastenings still. With the change of tide and the rising of the wind new ropes were accordingly put out by the mate. Five ropes now ran out front and four aft; the "bights" of these last going over the same posts. The ropes were seven and nine inch ropes, and all were new. No more ropes in fact could be applied forward than were applied. The cleets being all employed, the capstan was used besides. By degrees the wind increased and became high. It came "*in*

Statement of the case.

A.  The old wharf, where the Louisiana was moored.

B.  The new and better wharf.

C.  The bar where the Flushing was lying aground.

squalls," " *a pretty taut breeze*," " *a little more than ordinary;*" " *blowing fresh,*" " *blowing half a gale.*" In this gale the vessel—snapping her stern-lines first, and then on being forced round with her broadside to the wind, tearing away at the bow—broke off violently from her fastenings. At the stern, as already said, her *lines* broke; but at the bow the lines were so strong that they did not part. It was only by the cleets and capstan being torn up out of their places and so giving way that the vessel finally at this part got loose. Drifting sideward, to the west, with her bow towards shore, and past the new wharf, the Louisiana came down upon the Flushing, injuring her essentially. The captain and mates considered that "the accident was unavoidable." Other vessels, of which there were several in the neighborhood, kept to their fastenings; nor was there any other collision or accident of any kind in Hampton Roads on that day. The mate, under whose charge the vessel had been after the captain left her, said, on examination, "According to my judgment, the vessel was made sufficiently fast to lay at that wharf." When asked why he did not change the position of the boat to meet the change of tide and wind, he said, " I did not think there was any *necessity* for the change. We *were lying very nice* at the wharf; nor did I think it necessary to do more than I had done."

The distance from the old wharf to where the Flushing lay aground was about 800 feet. Testimony tended to show that if an anchor had been dropped anywhere within the first 400 feet of the distance over which the Louisiana drifted— that is to say anywhere *between* the two wharves, where the water is shallow—it might perhaps or probably have brought her up. No anchor, however, was thrown until she had drifted nearly 700 feet.

The testimony in regard to her manœuvres after she broke loose was not very clear. It was plain that she had drifted against the Flushing; nor did the witnesses agree as to the movements of her machinery. The captain "backed" her machinery, though not at immediately on breaking loose, which if he had *then* done would have cleared the Flushing.

The Circuit Court for Maryland, reversing a decree of the District Court in Admiralty, which had held the Louisiana not in fault, decreed against her for the full damage done, each party to pay his own costs. The case was now here for review.

*Mr. Schley, for the owners of the Louisiana, appellants in the suit:* The case shows that the owner of the Flushing had been guilty of neglect in suffering her to remain so long on Hampton Bar. She was a public nuisance. It was because she was improperly there at the time, that she was injured by the collision and did injury to the Louisiana. Even then, if the Louisiana was in fault, as the most favorable result for the Flushing, the damages of both should have been blended and divided. But this rule ought not to apply, in a case of public nuisance, especially as against one who did not wilfully commit injury. The owner of the Flushing might have abandoned the wreck, and would thus have escaped responsibility. But, holding possession, responsibility attached. In *Brown* v. *Mallett,*[*] Maule, J., delivering the judgment of the C. P., said:

"There seems no doubt that it is the duty of a person using a navigable river with a vessel of which he is possessed and has the control and management, to use reasonable skill and care to prevent mischief to other vessels, . . . and the liability is the same whether his vessel be in motion or stationary, floating or aground, under water or above it. In all these circumstances the vessel may continue to be in his possession and under his management."

And this view was approved in a later case, in the Exchequer, by Baron Alderson, speaking also for the court:

"The mere fact that one vessel strikes and damages another does not," said the late Chief Justice Taney,[†] "of itself, make her liable for the injury. The collision must, in some degree, be occasioned by her fault. A ship, pro-

---

* 5 Manning, Granger & Scott (57 English Common Law), 615.
† Brig James Gray v. Ship John Fraser, 21 Howard, 194.

perly secured, may, by the violence of a storm, be driven
from her moorings, and be forced against another vessel, in
spite of her efforts to avoid it.   Yet she certainly would not
be liable for damages, which it was not in her power to
prevent."   In *The Ligo*,* Sir C. Robinson said : " The law
requires that there should be preponderating evidence to fix
the loss on the party charged, before the court can adjudge
him to make compensation."   And in *The Bolina*,† Dr.
Lushington decided, that where there is no *primâ facie* evi-
dence of negligence and want of seamanship, the *onus* does
not necessarily attach to the party proceeded against, alleg-
ing inevitable accident, to prove it; but, on the party, seek-
ing indemnification, to prove that blame attaches to the
other party.

The mere fact, therefore, of the Louisiana breaking away
from the old wharf is no sufficient evidence of fault.

It will be remembered that soldiers had to be landed and
coal to be taken in, at the same time.   The vessel was laid
at the wharf and rigged in the only way practicable; her
stern necessarily projecting far past the wharf.   Expedition
was a duty.   It was a time of war.   It is not pretended that
sufficient fastenings were not made forward.   No more ropes
could be passed through the cleets, and therefore the cap-
stan also was used; and to show the sufficiency and strength
of the fastenings forward, the facts are shown, that the cables
forward did not part; that the cleets gave way, and the cap-
stan was broken.   It is clearly proved that when the wind
increased and the tide changed, additional lines were put
out.   The argument, therefore, must rest on the alleged in-
sufficiency of the fastenings from the stern of the boat to
the wharf.   Now, the case shows that, when the vessel first
laid at the wharf, she had three lines out; one at the stern,
and two forward.   Subsequently, the two forward were in-
creased to five; and the one aft was increased to four; and
the bights of those lines went over the same posts, which,

* 2 Haggard, 360.
† 3d Notes of Cases, 208, in 5 English Admiralty Reports, 208.

in effect, doubled the number. There is nothing in the case to show specially that the boat was carried off by any regular action of the reversed tide and increased wind. Against *these* the captain and mate guarded. We infer that it was some one *ir*regular action of the water—something not to have been foreseen as a result even of the changed conditions of tide and wind, which lifted up the stern of the vessel, slackened the stern fastenings, and thus enabled the storm at one special moment to get hold of the boat, and to cause the lines to snap, the wharf to give way, or the vessel to be torn asunder; no matter how strong the lines were. To consider this result as evidence of neglect, would destroy the notion of a special and inevitable accident, and would make the owners responsible not only for the storm, but for those hidden perils of the sea, not to be calculated against.

Will it be said that seamanship required of the captain to change his position at the wharf when the tide changed; that is to say, to liberate the steamer from her fastenings, and to go out into Hampton Roads, and come back to the wharf, and lay her bow to the *eastward*, facing the wind and tide? It is easy to be wise after a catastrophe; easy to avoid perils on which the stern-lights of experience are shining. But the question is, what was obligatory *before* the accident? The fact that the captain and mate of this vessel were appointed by the government to the discharge of a most responsible duty raises a presumption of their general capacity and carefulness. A general competency for their office of seamen must be inferred from it; and indeed is otherwise presumable. Now, as a matter of fact, the captain and mates believed that the vessel, fastened as she was, was safe. They thus thought upon considering the matter and looking at the case with all the evidences of risk before them. It was their conclusion *super materiem subjectam*, after discussion and advisement upon it. It was no fault of theirs that they thus believed; and as matter of fact, we repeat, they did thus believe. Now, suppose, believing as they thus truly did, that the vessel was safe—that the risks of staying still were greatly less than those of any attempt to rehand in

a high wind—that they had, nevertheless, cut loose, put out, attempted to reland, and in such attempt had met with some terrible disaster to their sick and wounded charge and cargo, what words, on such a result, would be wanting to express indignation at their rashness and folly? If in the effort to change the position of the steamer, the captain had been caught by a sudden squall, he would have been without excuse. It would then have been said, that he would have done right if he had remained at the wharf, and that if, in remaining there, he had been driven from its moorings, it would have been a case of inevitable accident. The *Juliet Erskine*\* would have been quoted on him. Dr. Lushington there says: "Where a collision takes place, when every prudent measure, consistent with ordinary seamanship, has been adopted, and carried into effect by the vessel proceeded against," it is a case of inevitable accident. So would the language of Taney, C. J., already cited. The argument *then* · would be that the captain had abandoned a sure protection, and had undertaken an unwise and dangerous and improper experiment.

Will it be said that the steamer was not properly managed after she broke loose? Even if this had been the case, great allowance should be made for any seeming errors, if such appeared, and the remarks in *The Genesee Chief*† would apply. In that case the court say: "If in the excitement and alarm of the moment, a different order might have been more fortunate, still, under the special facts, the court will not hold the party who might have given it responsible. He was in a situation where there was no time for thought. If an error had been committed, it would not, under the circumstances have been a fault." But, to those familiar with Hampton Roads, this mate's conduct was, in a high degree, judicious, and his orders precisely such as were necessary. When the steamer broke loose, she was drifting sideways and westward, her bows towards the beach. Unless backed she would have grounded; and, even if she had escaped the

---

\* 6 Notes of Cases (5 English Admiralty Reports, 534).

† 12 Howard, 461.

shoal, she would have come into collision with the vessels at the "new wharf." She was, therefore, properly backed, and escaped both. There was no room to work her, unless her bow could be brought to face the wind and tide, both of which were from the east. He cast an anchor—not for the purpose of riding to the anchor—but to produce the effect of changing the position of the steamer. This was the right manœuvre.

After an excellent argument by *Mr. Bernard Carter, of Baltimore* (his first before this bench), *and Mr. J. M. Campbell, contra,*

Mr. Justice GRIER delivered the opinion of the court.

The steamer Flushing being aground on Hampton Bar, out of the channel or course of vessels navigating the bay or harbor, and incapable of motion, cannot be justly charged with any participation in causing the collision.

The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major*, which human skill and precaution, and a proper display of nautical skill could not have prevented.

Now the facts show that the Louisiana has entirely failed to establish her defence.

1. The drifting of this vessel was not caused by any sudden hurricane which nautical experience could not anticipate. None of the other numerous vessels, at that time in the harbor, were driven from their moorings. The wind which arose was only of such a character that its effects might have been anticipated, and, by proper precaution, prevented;—"a half gale," "a stiff breeze," "a little more than ordinary."

The fact that the steamer was ordered by the government officers to take in coal at the old wharf, which had a narrow front when compared with the great length of the vessel, could not relieve the officers of the boat from the duty of securing her in such a manner as to prevent her drifting

when the change of the tide and winds changed the direction of the forces acting upon the vessel. And the fact that under these circumstances she *did* drift, is conclusive evidence that she was not sufficiently and properly secured.

It requires no assumption or affectation of any very great nautical skill in this court to point out the defects of the management of this vessel by the mate, who was left in charge of her. If the tide and wind could have been reasonably expected to remain as it was when, according to the mate's idea, the vessel was lying so "*very nice to the wharf*," we should probably not have heard of this case.

So long as things were in the condition in which they were when the vessel was first moored, she was sufficiently secured to meet any stress or force likely to be opposed to her in that direction. But when the tide changed so as to strike the stern with a momentum increased by a high wind, and multiplied by the leverage resulting from the length of the vessel exposed below the wharf, the "necessity" for a change of position ought to have suggested itself to a person of nautical skill, as a proper precaution against a danger which might justly have been anticipated. The fact that the captain and mate "did not anticipate the breaking away of the vessel, and thought the lines sufficient to hold her," may prove their want of judgment, but not that "the accident was unavoidable;" and this more especially, as other persons of nautical skill—disinterested witnesses in this case—found no difficulty in securing their vessels at the same place, and under similar circumstances.

2. It is not necessary to a decision of the cause to show that this collision might have been averted by a proper use of the anchors of the Louisiana, after she had broken away from her mooring at the wharf, or by a proper use of her steam power, further than to say, that the testimony in the case would well justify that conclusion.

We are of opinion, therefore, that the appellant has failed to show that the collision is the result of inevitable accident, and that the decree of the Circuit Court should be

AFFIRMED WITH COSTS.