## VANG et al. v. JONES & LAUGHLIN STEEL CORPORATION. *
### No. 56.

District Court, W. D. Pennsylvania.

Feb. 16, 1934.

476

Blaxter & O'Neill, of Pittsburgh, Pa., for libelants.

Wm. D. Evans, of Pittsburgh, Pa., for respondent.

SCHOONMAKER, District Judge.

This is an admiralty case in which the libelants are seeking to recover damages from respondent, alleged to have resulted from the breaking away of Barge 608 from the South Side Landing of Jones & Laughlin Steel Corporation in the city of Pittsburgh on the afternoon of March 14, 1933.

The defendant denies liability, but in event the court should find respondent responsible, the respondent then seeks limitation of its liability to the value of the barge and her freight pending.

The case was heard on the libel, answer, and proofs. From these we find the following facts:

### Statement of Facts.

On the afternoon of March 14, 1933, at about the hour of 3 o'clock, a large steel barge, known as Barge 608, owned by the Vesta Coal Company, broke away from her moorings at a landing maintained by the respondent at the foot of South 29th street, on the south side of the Monongahela river in the city of Pittsburgh. At this time there was no one aboard the barge, which then drifted down stream and struck and parted the headlines and cables with which a fleet of steel barges, river steamers, tow boats, derrick boats, and other floating equipment owned by the libelants was moored at the foot of South 23d street, on the south side of the Monongahela river, Pittsburgh, at a landing maintained at that point by the Iron City Sand & Gravel Company. The headlines and cables, with which this fleet was moored, parted and set it adrift. The fleet was carried down stream with the current. It became disorganized and scattered, tearing from their lashes a number of barges and other floating equipment on the outer edge of a second fleet of vessels moored between South 22d and South 21st streets, on the south side of the Monongahela river, at a landing which was also maintained at that point by the Iron City Sand & Gravel Company.

At the time this barge broke away from its moorings, a gorge comprising an accumulation of drift in the Monongahela river, had lodged against the upstream end of the barge in the slip in which she was then lying at the respondent's 29th Street Landing. This gorge had assumed such menacing proportions that it was deemed necessary to remove the barge from the slip in which she was lying for unloading purposes. The purpose of removing the barge from the slip was to afford an outlet for the drift which had accumulated behind her.

Employees of the respondent then undertook to shift the barge out of the slip, the first movement being accomplished by means of cables on the left-hand side of the barge, which were operated by a motor. The length of the cables permitted the barge to be shifted downstream in the slip about fifty feet. After that had been done, the barge was made fast on the right side by three hemp lines; the cables were then removed; and it was then the intention to slack out the three hemp lines by hand, while the current carried the barge some eighty feet down the slip where she was to be breasted out to her right and into a position made vacant for her by the removal of another barge. At the moment when this second operation of slacking out the three hemp lines was begun, the gorge which had accumulated in the slip suddenly broke, and after traversing the fifty feet of open water, struck the barge with such force that the first of the three hemp lines broke; the second one broke the mooring post to which it was secured; and the third one slipped off the mooring post to which the barge had been fastened. The current then carried the barge, now out of control, down the southerly bank of the river to the Iron City Sand & Gravel Company's landing at the foot of South 23d street, where it tore away from

their lashings a number of barges and other floating equipment.

At the time of these occurrences, the respondent was not the owner or the operator of said Barge 608, but merely had custody as bailee, for the purpose of unloading the barge at its unloading slip.

## Conclusions of Law.

(1) On these facts, we conclude that the respondent is liable for the damages consequent to the drifting of this barge from her mooring in the slip, and her collision with boats and other gravel equipment of libelants, which were moored to their landings, because respondent failed to show affirmatively by their proof that the breaking away of this barge was the result of inevitable accident or vis major, which human skill and precaution and a proper nautical skill could not have prevented.

(2) That the respondent is not entitled to the limited liability of the value of the barge and her freight pending.

## Discussion.

The rule applicable to this case was clearly stated by the Supreme Court in the case of The Louisiana, 3 Wall. 164, 173, 18 L. Ed. 85, as follows: "Collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution, and a proper display of nautical skill could not have prevented."

In our opinion, the respondent has not satisfactorily met the burden which shifted to the respondent when this barge broke loose, to exonerate itself from negligence. In our view of the case, the respondent was in fault in this matter in failing to anticipate the accumulation of drift in the slip behind the barge, and in failing to take timely precautions to prevent it. It appeared by the testimony that time and time again there was drift against this slip, which was used for placing vessels that were subject to discharge of their cargoes. It appeared by the evidence that in the Pittsburgh district the Monongahela river was a swollen stream as early as March 11, continuing to rise until the breaking away of this barge. Merwash, one of the employees at this landing, came to the landing on the 14th of March at 7 o'clock in the morning and saw that the river was rising. At that time he applied to the labor office for help because there was no gang

working that day upon the landing, coal being hoisted only Mondays, Wednesdays, and Fridays. At the time Merwash arrived, it must have been apparent from the rising river that drift would necessarily form against this slip, as it had in the past many times, and that unless Barge 608 were removed, the mass of drift would undoubtedly accumulate behind her. The barge might easily have been moved out of the slip the first thing in the morning after Merwash arrived, without any danger from the drift.

The respondent was at fault in failing to anticipate that, after the shifting of the barge as far as possible from the accumulated drift by the cables operated by steam power, the gorge might break loose and come down into the slip against the barge. Proper precaution should have been taken to protect the barge from this hazard. When the respondent undertook to let this barge out of the slip by the use of hemp lines only, and without the aid of a steamboat or other power control, it did not take such precaution. It would seem very apparent to us that anybody might have anticipated that after the gorge broke loose against a boat of that size, it would be impossible to hold it merely by hand lines.

As we view the case, the respondent has surely failed to meet the burden which the law cast upon it to show that this accident was inevitable, occasioned by a superior force which a proper display of nautical skill could not have foreseen and prevented.

There is no evidence in the case from which we can find that libelants were guilty of any contributory fault.

We therefore conclude that the respondent is liable for the damage claimed by libelants caused by the breaking away of this Barge 608 from its moorings, and that a commissioner should be appointed to take evidence as to the damages sustained by libelants by reason thereof.

On the question of limited liability, we hold that in view of the fact that the respondent had possession of Barge 608 merely for the purpose of unloading coal after the barge had been delivered at its landing place by the Vesta Coal Company, it was not a charterer of the vessel. The respondent had custody of the boat solely to unload it, and its duty was to hold the boat safely at its landing place until that unloading was accomplished. The respondent, of course, would be liable for the damage resulting from

478

the breaking away of this boat from this landing place. We cannot find that under section 4286 of the Revised Statutes of the United States, USCA, title 46, § 186, the respondent was charterer of this barge. That section provides: "The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels; and such vessel, when so chartered, shall be liable in the same manner as if navigated by the owner thereof."

The Supreme Court has defined a chartered vessel as follows: "A charter-party is defined to be 'a contract by which a ship, or some principal part thereof, is let to a merchant, for the conveyance of goods on a determined voyage to one or more places.'" Ward v. Thompson, 22 How. (63 U. S.) 330, 333, 16 L. Ed. 249. There is no evidence from which we can find that the respondent came within the provisions of this statute in relation to manning, victualing, and navigating this barge at its expense. There is no evidence in this case from which we can find that this Barge 608, or any part thereof, had been chartered by the respondent in this case, within the meaning of a charter party, as defined by the Supreme Court. The Vesta Coal Company used whatever vessels it desired for the purpose of delivering to the respondent what that company sold to the respondent. A tug boat owned by the Vesta Coal Company delivered the barge in question to the landing of the respondent; the coal company paid its officers and crew. When once delivered at the landing place, the respondent had the right to detain the barge there until it was unloaded; and when unloaded, it was placed in the Vesta fleet until the coal company was ready to remove it.

We therefore conclude that respondent was a bailee of the barge while it was at its wharf for unloading purposes, and was responsible for a bailee's care of the boat as long as it was tied up at the wharf of the respondent. In re Pennsylvania R. Co. (C. C. A.) 48 F.(2d) 559.

Let an interlocutory decree be submitted holding the respondent solely at fault in this case, awarding the libelants their damages, with costs, and directing the appointments of a commissioner to receive proof of damages. Further, let an order be submitted denying the respondent's petition to limit its liability.