**ESSO STANDARD OIL, S. A.,**

v.

**THE S.S. SABRINA & Companie de Navegacion Anne, S. A., etc.**

No. 4036.

United States District Court
Canal Zone, Division Balboa.

March 24, 1957.

As Amended Sept. 26, 1957.

Kirlin, Campbell & Keating, New York City (Raymond T. Greene and Stephen J. Buckley, New York City, Advocates), Roy P. Phillipps, Manuel G. Mendez, Panama City, Republic of Panama, proctors, for libelant and cross respondent.

Nelson, Healy, Baillie & Burke; Galef & Jacobs, Haight, Gardner, Poor & Havens, New York City, and L. S. Carrington, Balboa, Canal Zone, proctors for respondent.

CROWE, District Judge.

A libel in personam with clause of foreign attachment was filed by Rederiaktierbolaget (Hans Von Rettig A/B and Wilh. Renson O/Y) against the S.S. Sabrina and Companie de Navegacion Anne, S. A., and later a number of other libels and intervening libels were filed against the respondents among them being the libel of the libellant in this action, Esso Standard Oil Co., S. A., filed in rem and personam.

The libellant is a Panamanian corporation and was at the times mentioned in the libel the owner and operator of certain unloading installations at San Jose, Guatemala. It alleges that Compania de

Navegacion Anne, S. A. too is a Panamanian corporation and that on or about July 29, 1954, the S.S. Sabrina, while maneuvering in the harbor of San Jose, was caused by the negligent acts of respondents agents, servants or employees to come into contact with and damage unloading installations including the destruction of certain quantities of stored asphalt all in the amount of $50,000.

The libellant alleged that the ship was not in charge of competent persons, a proper lookout was not kept, she was maneuvered while approaching the unloading installations in an unseamanlike and negligent manner, proper precautions were not taken to avoid the collision when the danger was or should have been apparent to those in charge and she collided with the unloading installations without justifiable cause.

On December 13, 1954, a default was entered but upon a showing by affidavits that respondent failed to answer by reason of the illness of its local proctor the default was set aside by the court on the filing of a bond for costs and the respondent was permitted to answer.

The answer of the respondent contains a general denial and in addition pleads that even if there was negligence and the damage was the direct result of the negligence, neither Compania Anne nor the Sabrina is liable because of the provisions of the charter party between the libellant and respondent, Compania de Navegacion Anne, S. A., which contains a standard "General Exception Clause."

Respondent also complains of the acts of the libellant in a cross-libel wherein it is alleged that as a result of cross-respondent's failure to designate and procure a safe discharging place, in accordance with the terms of the charter party, and as a result of the negligence of cross-respondent's pilot and mooring master the S.S. Sabrina was damaged in the amount of $5,342 by reason of loss and destruction of tackle, cost of material used to remove asphalt spilled on the vessel, paint for repainting and crew labor in connection with cleaning and repainting by reason of the spilling of asphalt

occasioned in maneuvering at the discharging place of cross-respondent during certain storms and strong currents in attempts to discharge its cargo. The sum of $298 is also claimed for the use of cross-libellant's hoisting equipment in connection with repairs made to cross-respondent's submarine hose, assistance rendered to divers by the Sabrina's crew and meals served to cross-respondent's boat crew and laborers engaged in the repairs.

### The Facts

Libellant, Esso, is the owner and operator of an unloading installation for petroleum products at San Jose, Guatemala, which at the time of the injury complained of, had four parallel undersea pipelines of steel extending from the shore into the sea to receive petroleum products from vessels anchored in the open roadstead. The left pipeline, looking seaward, was a ten inch line, the next line was 8 inches in diameter and the third and fourth lines were 4 inch pipes and each pipe was at a distance of five feet from its neighbor.

The pipes were staggered in length with the ten inch or No. 1 pipe longest, the 8 inch or No. 2 next, and the four inch or No. 3 and No. 4 pipes extending the shortest distance and on each pipe was a rubber hose of 120 feet in length.

The ends of the pipes were in 40 feet of water. The ends of the pipe and the ends of the hoses were marked by special floating buoys attached to the pipes and hoses by chain so that the vessels using the discharging facilities could locate them.

The hoses were composed of four thirty foot pieces connected to each other by flanges and the unloading ships took the hose ends aboard by means of the ships' hoisting gear and connected them to the ships' manifolds through which they discharged their cargo by means of their own pumps.

According to Esso's Exhibit No. 3, which is a chart of the mooring facilities, the 10 inch pipeline extends 2095' into the sea, the 8 inch pipeline, 30 feet shorter and the 4 inch lines, each 50' shorter

than the 8 inch line. The unloading ship moors at a 90° angle to the shoreline with its stern shoreward and its midships, where its manifold is located, at the hose ends. Each ship must use both bow anchors and secure its stern with lines to three mooring buoys located in appropriate positions for the purpose.

At 0423 on the morning of July 25, 1954 the Sabrina anchored at San Jose where she had sailed pursuant to the terms of a tanker voyage charter between Esso and Compania Anne to discharge a cargo of fuel oil and asphalt. The ship was under the command of Captain Fritz Janke, a German with many years experience as a seaman and captain.

The vessel was boarded by the port authorities and Mr. Hermogenes Moreno F., Esso's terminal superintendent at San Jose. After receiving clearance from the port authorities the Sabrina proceeded to Esso's unloading installation with Mr. Moreno on board and in fact he was on board almost continuously during the stay of the vessel at the port.

The Sabrina engaged in maneuvers to become moored in accordance with the plan described but in doing so the starboard anchor chain broke and the anchor was lost. The mooring was completed at 1800 of the same day however, and it was decided by Moreno that the asphalt would first be discharged through the 10 inch line. By mutual accord the discharging was to begin but it was necessary to construct a reducer to join the Sabrina's 8 inch manifold to the 10 inch hose so discharging did not commence until 0340 on July 26th.

It was noticed that the asphalt was moving very slowly into the shore tanks although the pressure of the pumps was high and a diver reported that there was a bend in the connecting hose so discharging was stopped at 1015. Moreno testified that he noticed that the ship had drifted shoreward so that the buoy marking the end of the steel pipe was forward of the ship's manifold but this is denied by Captain Janke.

An attempt to raise the 8 inch hose failed because the hose caught on the ship's bottom. At this point, there is considerable conflict of testimony. Moreno says that he did not know the starboard anchor was lost until that time because he asked the master to move the ship forward by heaving in on the anchor and that it was then discovered the anchor was gone. Captain Janke denies this saying that he knew of the loss of the anchor at the time of loss, which occurred when maneuvering to moor.

Attempts were made to find the anchor which were successful and the end of the chain was brought aboard and secured. At this time, which was 2230 of the 26th, a violent local storm known as a "chubasco" arose and some of the lines aft connected to the buoys parted and the captain ordered the remaining after moorings slipped and put the vessel underway to prevent going on the beach.

The storm subsided and by 0200 on the 27th of July the starboard anchor chain was connected but mooring was delayed as no mooring boats were available to carry the after lines to the buoys for other vessels in the harbor were having mooring troubles by reason of the "chubasco."

At 2045, mooring was completed with the two anchors forward and six 9 inch ropes aft to the three mooring buoys. The ship arrangement was approved by Moreno and he ordered the 8 inch hose connected and discharging began at 2130.

At 0100 on July 28th, another "chubasco" arose and the ship began to move shoreward. The captain was awakened and Moreno, who had been sleeping on board, assisted by one of his subordinates, dropped the hose. In dropping the hose considerable difficulty was encountered and asphalt spewed over the ship and the heavy hose end damaged some of the ship's railings and superstructure.

The wind was coming from the east and blew on the port side so that although the ship dragged both anchors the port anchor was most affected and

the ship moved backward into the starboard mooring buoy fouling the starboard propeller so that the vessel could use only her port engine to prevent being beached.

The mooring lines were slipped or cut and at daylight and when the storm subsided, the Sabrina was able to move from the buoy by heaving on its anchors.

The Sabrina weighed anchors until July 29th when through an 8 hour mooring operation she again was ready to discharge at 1605 of that date.

The operation began through the 8 inch hose and the asphalt started moving at 1700 but at 2215 Esso gave instructions not to use the 8 inch line further as it was leaking and a diver discovered that it was broken and unserviceable and the hose was let go.

Thereafter, steps were taken by Esso to clear its lines using the Sabrina as a salvage ship and the 10 inch hose was restored to service. A third "chubasco" struck during the repair process but the vessel remained in position as it was not so violent.

At 1620 on July 31st discharging was resumed through the repaired 10 inch pipe and discharging stopped at Esso's request at 1200, August 1st as the tanks were filled and at 1500 on the same day the Sabrina sailed for Acajutla.

### Findings of Fact and Conclusions of Law

1. The Sabrina was under the command of Captain Janke, a seaman of many years of experience, who recognized that Moreno, the superintendent of Esso, was not a seaman. He never relinquished control of his vessel to Moreno, he did not look upon him as a pilot or even a docking master and although he may have relied upon him for advice relative to the location of Esso's facilities and the proper manner to moor the ship to discharge, he was in charge of the operation and navigation of the vessel at all times and it was his duty to exercise a high degree of care in accordance with the skill necessary in the control and management of a modern ocean-going tankship to avoid injury to Esso's installation. The Court concludes that any damage received by reason of the negligent mooring or negligent management of the vessel after mooring was the responsibility of the master and not Moreno.

2. The Court finds that the Sabrina lost her position at the end of the pipeline and drifted shoreward causing the kink in the ten inch line by reason of the failure of the captain to have the vessel secured in accordance with the approved mooring plan. He lost the starboard anchor and started discharging without recovering it and using it to stabilize the ship, after being advised concerning the treachery of the winds and the currents in the locality through hydrographic publications, his own experience in mooring the vessel and the advice of Moreno.

In spite of this advice and information, he permitted the coupling of the hose to the Sabrina's manifold and the drifting of the ship caused the hose to kink and become damaged and unserviceable.

Whether or not the respondent was negligent in the loss of the anchor does not seem to the Court to be important in determining the responsibility for the damage to the 10 inch line for it is believed by the Court to be caused by the negligent failure to use a starboard anchor in effecting a secure anchorage. The captain should have fished up the anchor before proceeding to discharge or used another.

3. The Court adjudges that the damage to the 8 inch line occurred during the second "chubasco" that struck the Sabrina but it was due to the "perils, dangers or accidents of the seas."

The Court can find no negligence here. The local storm or "chubasco" came up suddenly in the middle of the night when the regular sea watch was on duty. According to the captain, the chief officer who was in charge of the cargo operation, probably was also on deck at the time and the captain awoke and was on deck almost immediately. Everything

appeared to have been done that could have been done under the circumstances with Mr. Moreno, Esso's agent, testifying that he had had no previous experience where a vessel had to be suddenly cut loose from the discharging line before, but he stated "I consider it properly done."

The starboard anchor had been recovered and the Sabrina was secured in accordance with Esso's mooring plan with both anchors out forward and the mooring aft made with lines to the buoys.

Libellant argues that the loss of the starboard anchor was due to the negligence of the Sabrina in failing to inspect its anchor chain before dropping anchor and that the discharge was suspended for 12 hours and 15 minutes due to this negligence and in view of Captain Janke's knowledge of the probability of frequent "chubascos" it was a foreseeable consequence that the failure to inspect the chain and the resulting delay was the increased risk that a "chubasco" would occur.

The only proof of inspection that the Court has before it is the Cia. Anne Exhibit D showing an inspection and test for anchor and chain at Hamburg on May 27, 1953, a year and two months before the chain parted and the anchor was lost. There is nothing before the Court to show that an inspection over a year before the break is adequate or inadequate, but it is believed that an inspection annually or even biannually of this type of equipment would ordinarily be adequate.

However, a calculation by the Court from the exhibits of the time spent in discharging after the first "chubasco" comes to a total of 27 hours and 55 minutes, therefore, the delay of 12 hours and 15 minutes complained of by the libellant would have been absorbed in the necessary time for discharge had the anchor not been lost and the "chubasco" would have struck the ship even though the discharging was uninterrupted by the search for the anchor.

The disconnecting of the 10 inch hose when kinked occurred at 1015 on the 26th and the first "chubasco" struck at 2230 so there was a loss of discharging time of 12 hours and 15 minutes while the search for the anchor ensued before the storm struck.

The "chubasco," during which no discharging could have occurred, together with the attendant remooring lasted until 2130 of the 27th when the hose was then connected and discharging began again. The ship was struck by the "chubasco" that brought about the damage to the 8 inch line at 0100 on the 28th only 3 hours and 30 minutes after starting to discharge for the second time. Thus, adding the time lost for searching for the anchor of 12 hours and 15 minutes to the 3 hours and 30 minutes of discharge time before the second "chubasco" we have a total of 15 hours and 45 minutes of discharge time available before the striking of the second "chubasco" while the time required to discharge after the first "chubasco" as stated and in accordance with the captain's report, Esso's Exhibit 4 was 27 hours and 55 minutes so the vessel would have been at its berth discharging when the second "chubasco" struck had there been no delay from the breaking of the anchor chain.

Thus, it is the opinion of the Court that the striking of the ship by the second "chubasco" falls into the category of inevitable accident and was not occasioned nor implemented in any way by the loss of the anchor.

4. Esso argues further that a vessel breaking her moorings and dragging anchor and as a result doing damage to a shore installation is prima facie liable. This presumption, however, is successfully rebutted by the testimony of the Captain and Moreno which show affirmatively that all proper precautions had been taken and proper navigational skill together with reasonable care were exercised.

Esso cannot be heard to say that the vessel was not moored correctly because

it was moored in accordance with Esso's own plan which Esso had furnished and approved through its agent Moreno, in full knowledge that the "chubasco" season was present.

It complains that the Sabrina's master failed to take proper precautions because no effort was made to alert the engine room for over half an hour after the storm struck. Contrary to this the Captain testified that the engines were diesel and on standby at all times and could be in use within ten minutes and all hands had been ordered out. He was delayed from using them because of being hooked to the hose. Before the hose could be unhooked he had to give notice to the shore installations so that the valves could be closed to prevent the tanks from emptying into the sea and they were slow to reply to his signals. Thereafter it was necessary for the Esso men and the ship's crew to unbolt the hose which was very difficult because of the storm and took from 10 to 15 minutes in which it was necessary to cut the cable holding the hose. Until the hose was released the after lines could not be released for then the strain would have been thrown to the hose and undersea pipe. The engines could not be used until the hose and after lines were released for fear of fouling the propellers and leaving the vessel without motive power and thus causing her to strand.

" 'The mere fact that one vessel strikes and damages another does not of itself, make her liable for the injury. The collision must in some degree be occasioned by her fault.' " Quoting Chief Justice Taney in the Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85.

It appears to this Court that everything was done that could have been done and there was no negligence or "fault" shown on the part of the Sabrina or her crew.

■ 5. The Court cannot agree with respondents contention that the "General Exceptions Clause" contained in the charter party relieves it of liability for the tortious acts of the master in regard to its installations.

The preamble of the charter party is definitive and conveys the intent of the parties that it is a contract between a carrier and supplier as to the cargo carried.

Under the terms of the clause neither the vessel nor Compania Anne, her owner, is liable for any loss, damage or delay to the cargo, or for any failure in performing under the charter party, arising or resulting from certain contingencies, including any act, neglect or default of the Master, mariners or other servants of the owner in the navigation or management of the vessel, collision, perils, dangers or accidents of the seas or other navigable waters, any act or omission of the Charterer, latent defect in the equipment or appurtenances of the vessel, unseaworthiness of the vessel unless caused by want of due diligence on the part of the owner, or from any other cause arising without the actual fault or privity of the owner.

The Court holds that this language when read in the light of the entire instrument does not, as argued by respondent, relieve the libellant of liability for its torts and make it liable for breach of contract only. All the exemptions and limitations in favor of the vessel owner in the Charter refer only to the vessel owner's obligations to load, carry and discharge the charterer's cargo and any negligent act that he or his agents may commit in the use of the vessel in injuring the property or installations of the libellant sounds in tort and redress therefore lies in an action for damages under the theory of negligence.

■ 6. The Court does not agree with respondent and cross-libellant that it should recover from libellant under its cross-libel for the injuries done to the vessel. It is apparent from the charter party under the typewritten clause added to Part I that the cross-libellant was fully in accord with the plan to moor at sea loading and discharging terminals and in fact agreed that the vessel should

be furnished with suitable equipment to effect such moorings.

The added typwritten clause is as follows:

"5. The vessel shall be furnished with suitable ground tackle and sufficient mooring line to safely moor at sea loading and discharging terminals and with adequate equipment for handling submarine hose at such installation."

Nothing could be plainer to this Court that she contemplated anchoring in the open roadstead and in his testimony Captain Janke admitted that he knew before sailing for San Jose, that he was to moor at a sea discharging berth during the "chubasco" season.

As cited, in The Helios, 2 Cir., 115 F. 705: If the port is in contemplation of the parties at the time the charter is made, the master must be prepared to face such dangers as are known to exist there.

There is no showing that the berth was unsafe. To the contrary, it had been in use since 1947 and ships had been discharging there on the average of two a month.

Moreno testified that it was the first time in his experience that a ship had to suddenly let go and he had been there since 1949.

The Court does not think that the berth was proven unsafe in violation of the terms of the contract and is of the opinion that the same inevitable accident, the violent natural storm, one of the perils of the sea, that caused the damage to the 8 inch pipe of libellant, was responsible for the damage to the ship of cross-libellant and there can be no recovery.

7. In summation the Court concludes and finds that the Master of the Sabrina was guilty of negligence in causing the damage to libellant's 10 inch pipeline and any expense of repairs or restoration or damage thereto should be borne by the respondents. It finds further that the damage to the libelant's 8 inch pipeline was due to the perils and accidents of the sea and under the theory of inevitable accident the respondents are not liable. It also finds that there is no liability on the part of the libellant to the respondent cross-libellant under the cross-libel as the injuries suffered by the vessel were due also to the perils and accidents of the sea and the theory of inevitable accident is applicable and the cross-libel should be dismissed with the exception that any services shown to have been rendered by the Sabrina in restoring or repairing the 10 inch hose should be recovered or credited.

The parties having agreed in open court that the matter should first be heard on the question of liability and as no proof as to damages has been offered, the Court directs the proctors for the libellant to prepare an order in accordance with these findings and the case is continued for further orders relative to reference to commissioners or the taking of proof for the determination of the damages and the extent of liability.