# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 12, 2010

Lyle W. Cayce
Clerk

No. 10-30433
Summary Calendar

SANDRA SIMMONS; JACK SIMMONS,

Plaintiffs–Appellants

v.

JUDY C. BERGLIN,

Defendant–Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:07-CV-5911

Before WIENER, PRADO, and OWEN, Circuit Judges.

PER CURIAM:[*]

During Hurricane Katrina, the TRUST ME II, a forty-seven-foot sailboat owned by Judy C. Berglin, came loose from its moorings, washed ashore, and damaged Sandra and Jack Simmons' ("Plaintiffs") property. Plaintiffs sued Berglin for the damage, but the district court granted summary judgment in favor of Berglin. Plaintiffs appeal, and we now affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-30433

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs own a house on Moonraker Drive in the Eden Isles subdivision in Slidell, Louisiana, on the north shore of Lake Pontchartrain.  Berglin, who had moved to Oregon three or four years before Hurricane Katrina, kept the TRUST ME II continuously moored to a wooden finger dock by Pontchartrain Drive, between one-half-mile and one-mile south of Plaintiffs' house.  Berglin was in the New Orleans area visiting her daughter about seven to ten days before the hurricane hit.  During this visit, she asked two of her dock neighbors, Frank Beber and Pete Thompson, to check on the TRUST ME II to make sure that it was ready for the storm.

Thompson, a boat builder who lived on a sixty-five-foot schooner, often cared for the TRUST ME II in Berglin's absence.  Beber, a mariner with over forty years of marine experience, was a licensed Master in the Merchant Marines and served as the safety officer aboard the U.S. Coast Guard's 300-foot "tall ship" EAGLE, where his duties included overseeing the vessel's moorings.  He owned several boats, including a thirty-foot trimaran that he kept docked in the slip adjacent to the TRUST ME II.  Berglin did not tell Beber or Thompson how to secure the TRUST ME II, but at her deposition, she testified that Beber knew more about boats than she did and that she trusted him to do what was best under the circumstances.

Thompson and Beber both checked on the TRUST ME II before the storm. The boat was already tied to the pilings with seven 3/4-inch lines: two lines on the bow, two spring lines midship, two lines on the stern, and one line that ran from the stern diagonally back across the boat to the seawall.  At his deposition, Beber characterized this arrangement as "overkill," explaining that "a 3/4 inch line on a nine-ton boat is far more than you would normally use on a boat that size."  To prepare for the storm, Beber doubled the spring lines on the midship cleats and added two extra 3/4-inch lines on the bowsprit and one extra spring

2

line from the bowsprit to one of the aft pilings. He gave the lines about six inches of slack. Beber testified that he put as much line on the TRUST ME II's cleats as possible and that the vessel was as secure as it could have been at that location. He said that he wanted to make sure that the TRUST ME II was as secure as possible because he did not want it to break free and damage his own sailboat in the adjacent slip. Beber then evacuated.

When the center of Hurricane Katrina hit the Eden Isles area, the storm surge was unprecedented. According to Beber, the water rose twenty to twenty-two feet above mean sea level at his dock. Jack Simmons, who weathered the storm at home, testified that the water level rose fifteen to sixteen feet at his house. Either way, Hurricane Katrina's storm surge was significantly higher than the four-feet rise that occurred during Hurricane Georges in 1998, which was the highest surge that either Berglin or Beber had seen in the Eden Isles area during a hurricane.

When Beber returned to his dock a couple of days later, he found almost-complete devastation. The marina had been demolished by the storm. Berglin's dock had been destroyed, the buildings next to her dock had collapsed, and the TRUST ME II was missing. The aft pilings that the TRUST ME II had been tied to had been bent over at a forty-five degree angle; its forward pilings were still standing, but only because they were bolted to the concrete seawall. Every other dock in the area had also been destroyed, and all of the vessels that had been moored to those docks, other than Beber's own sailboat, had been ripped from their moorings and scattered. Beber's boat had not come loose, but it had been dismasted, cut in two, and sunk, along with his entire dock. Plaintiffs found the TRUST ME II in their backyard. They claim that it damaged their pier, seawall, cabana, pool, fences, and sidewalks.

Plaintiffs filed suit against Berglin, alleging that she was responsible for the damage because she had failed to take adequate precautions to make sure

that the TRUST ME II was secure.[1]  On February 19, 2010, Berlin moved for summary judgment, arguing that the claims against her should be dismissed because the damage to Plaintiffs' property was caused by an Act of God.  On March 19, 2010, the district court awarded summary judgment to Berglin.  It found that the Act of God defense applied in this case because"[t]he undisputed facts show that Berglin's actions in hav[ing] the vessel secured in anticipation of Hurricane Katrina were reasonable under the circumstances."

Plaintiffs appeal.  They concede that they have no personal knowledge about how the TRUST ME II was moored before the hurricane, what measures Berglin or her agents took to secure the vessel, or what condition the docks and pilings were in after the storm.  Nonetheless, they contend that Berglin has failed to show that there is no genuine issue of fact as to whether she took all reasonable precautions under the circumstances to ensure that her vessel did not break loose during Hurricane Katrina.

## II.  STANDARD OF REVIEW

We review an order granting summary judgment *de novo*, applying the same standard as the district court.  *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010).  "We view the evidence in the light most favorable to the non-moving party and avoid credibility determinations and weighing of the evidence."  *Id.* (citation omitted).  We will uphold a grant of summary judgment where "the competent summary judgment evidence demonstrates that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  *Id.* (citation omitted).  "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The mere argued existence of a factual dispute does not defeat an otherwise properly

---

[1] Plaintiffs also sued St. Paul Fire and Marine Insurance Co., which insured Berglin and the TRUST ME II at the time of Hurricane Katrina.

No. 10-30433

supported motion. *See Anderson*, 477 U.S. at 248. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249–50 (citations omitted).

### III. ANALYSIS

Under the general maritime law, when a drifting vessel causes damage to a stationary object, there is a presumption that the moving vessel is at fault. *The Louisiana*, 70 U.S. (3 Wall.) 164, 173 (1865). This presumption is based on the logical deduction that a vessel found loose and adrift was mishandled or improperly moored. *James v. River Parishes Co.*, 686 F.2d 1129, 1132–33 (5th Cir. 1982). "The party against whom the presumption operates bears the burden of disproving it, not merely coming forward with countervailing evidence." *Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 449 (5th Cir. 1987) (citation omitted).

The drifting vessel may rebut this presumption by showing, by a preponderance of the evidence, that the collision was an inevitable accident or the result of an Act of God. *See The Louisiana*, 70 U.S. at 173. "'The burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense.' The vessel must show that the accident could not have been prevented by 'human skill and precaution and a proper display of nautical skills . . . .'" *James*, 686 F.2d at 1132 (quoting *In re United States* (*Dammers & Van Der Heide Shipping & Trading (Antilles), Inc. v. The Steamship Joseph Lykes*), 425 F.2d 991, 995 (5th Cir. 1970)) (alterations omitted).

> The test for determining whether [Berglin is] free from fault is whether [she] took reasonable precautions under the circumstances as known or reasonably to be anticipated. If [she was] reasonable in [her] anticipation of the severity of the impending storm and undertook reasonable preparations in light of such anticipation, then [she is] relieved of liability.

No. 10-30433

*In re United States*, 425 F.2d at 995; *see also Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 726 (5th Cir. 1967) (holding that the vessel asserting the defense "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required").[2]

The district court found that Hurricane Katrina was as an Act of God.  It based this finding on similar findings by other federal and state courts and on the National Hurricane Center's post-storm assessment that Hurricane Katrina was "an extraordinarily powerful and deadly hurricane that carved a wide swath of catastrophic damage and inflicted large loss of life" and was "one of the most devastating natural disasters in United States history."  Further, the record in this case shows that Hurricane Katrina's high storm surge caused extensive damage to the Eden Isles area in particular.  Plaintiffs do not contest this finding on appeal.  They argue only that Berglin has failed to show that there is no genuine issue of fact as to whether Berglin took all reasonable precautions under the circumstances to prevent the TRUST ME II from breaking loose from its moorings.

We disagree.  Based on the summary-judgment record before us, we find that no reasonable juror could say that Berglin acted unreasonably under the circumstances.  Berglin asked two experienced mariners to check on her boat before the hurricane.  Both men, as her agents, did what she had requested, and one of them, Beber, added extra mooring lines to ensure that the already over-secured boat would not break loose.  His uncontested deposition testimony was that the TRUST ME II was as secure as it could be in that location.

---

[2] *Accord Terre Aux Boeufs Land Co. v. J.R. Gray Barge Co.*, 2000-2754, p. 9 (La. App. 4 Cir. 11/14/01; 803 So. 2d 86, 93 ("[T]he purpose of the Act of God defense is to relieve a defendant from liability for damages when the following elements are present: (1) the damages claimed were caused by the Act of God, and (2) no amount of prudence or care on the part of the defendant could have prevented the damages from occurring.").

No. 10-30433

Despite these reasonable precautions, the hurricane's unheard-of storm surge destroyed Berglin's dock and the docks around it, collapsed the buildings next to the docks, bent Berglin's aft pilings by forty-five degrees, and ripped all but one of the sailing boats in the vicinity from their moorings, including the TRUST ME II.  The one sailboat in the vicinity that was not sent adrift was Beber's sailboat, which was cut in half and sunk along with the dock that it was tied to.  Given the unexpected strength of Hurricane Katrina, and because it destroyed TRUST ME II's own dock, we find not only that Berglin and her agents were reasonable in preparing for the storm, but also that no reasonable juror could say that Berglin's actions or omissions, even if negligent, had any effect on whether the TRUST ME II broke free from its moorings.

None of Plaintiffs' counter-arguments on appeal have any merit.  First, Plaintiffs argue that Berglin was negligent because she took no steps to prepare for the hurricane other than to ask one of her dock neighbors to check on the TRUST ME II, and because she failed to follow up on the condition of the TRUST ME II after the hurricane.  But the record shows that Berglin asked more than one person to check on her boat; she asked two experienced mariners to do so.  Both men checked on the boat, and Beber added extra mooring lines to the boat before the storm.  Beber and Thompson's actions were reasonable under the circumstances, and as her agents, they are imputed to Berglin.  As for Berglin's actions after the storm, the Act of God defense, as applied in this kind of case, asks whether the custodian of the moving vessel took reasonable precautions before the storm to avoid the damage.  As a result, what Berglin did or did not do after the storm is not relevant. Given the record in this case, Berglin's failure to contact either Thompson or Beber after the storm and ask about the condition of the TRUST ME II does not tend to show that the actual precautions that Berglin, Thompson, and Beber took before the storm were in any way negligent or unreasonable.

No. 10-30433

Second, Plaintiffs argue that Berglin was negligent because she did not inspect the TRUST ME II's mooring lines during the three or fours years that she lived in Oregon before Hurricane Katrina. As a result, Plaintiffs contend, she did not know whether those lines were in serviceable condition or needed to be replaced. The record, however, shows that Thompson regularly checked on the TRUST ME II during Berglin's absence. In addition, there is no evidence in the record about the actual condition of the TRUST ME II's original mooring lines before the hurricane, nor is there any evidence showing that mooring lines should be replaced after less than three to four years as a general rule. Beber testified that he added extra mooring lines and that he made sure the vessel was as secure as it could be before the storm. Plaintiffs do not assert that the extra lines were also defective, and Beber's testimony about the condition of the vessel before the storm is uncontested. Thus, Plaintiffs' argument is nothing more than an unsubstantiated accusation.

Third, Plaintiffs argue that Berglin was negligent because she permitted the TRUST ME II to be tied down with mooring line that was 3/4-inches thick, which Beber characterized as "overkill." To support their argument, Plaintiffs point to the following sentence in Berglin's marine expert's report: "Boater's Pocket Reference: Chapter 4 recommends not over sizing mooring lines for the boat size since the line will not stretch when the boat heaves on it." This record does not create a genuine issue of fact as to whether Berglin was negligent in using 3/4-inch line. First, Plaintiffs have misconstrued Beber's testimony about the 3/4-inch line being "overkill." Beber did not testify that it was *wrong* to secure a sailboat in *adverse* weather conditions with 3/4-inch line; he said only that the use of 3/4-inch line was *more than sufficient* to secure a nine-ton sailboat under *normal* weather conditions. In fact, Beber's actions show that he thought that the 3/4-inch line was appropriate in this case, because he secured the TRUST ME II before the storm with at least two additional 3/4-inch lines.

8

Second, the expert's citation to the "Boater's Pocket Reference" is also unavailing. The reference guide merely "recommends" a course of action, and its recommendation is too vague to be relied on: it does not define an over-sized mooring line. It does not say that a 3/4-inch line is too big for a nine-ton boat. And it does not explain whether different-size lines are more appropriate in adverse weather conditions.

Fourth, Plaintiffs argue that Berglin was negligent because her agent, Beber, failed to attach the TRUST ME II's mooring lines high enough on the pilings or with enough slack to allow the vessel to rise with the storm surge. To support this argument, Plaintiffs presented an expert report by Ronald Morris, a marine investigator, which says that in advance of a hurricane, mooring lines should be attached "as high on pilings as possible and with enough slack that allow for storm surges related to the Hurricane Category threat level." Thus, by Morris's logic, Beber should have given the TRUST ME II enough freedom of movement—either by attaching the lines higher on the pilings (which stood only twelve feet out of the water), by giving the lines several feet of slack, or by some combination of the two—to permit the vessel to ride the storm surge up at least fifteen or sixteen feet. Such an arrangement would have allowed a large boat to heave unrestrained for most of the rise of the surge, and the boat would have likely come loose well before the surge reached its highest point. Accordingly, we agree with the district court's assessment that "it would not have been reasonable to moor the TRUST ME II with enough slack to account for any storm surge that may be created by a Category 5 hurricane."

Lastly, Plaintiffs argue that Berglin was presumptively negligent because at least four other boats of comparable size to the TRUST ME II did not come loose during Hurricane Katrina. But none of these comparators were similarly situated to the TRUST ME II. The first boat is a thirty-nine-foot aluminum-hulled sailboat that had been docked close to the TRUST ME II. But this boat

became unmoored during the storm, so it does not support Plaintiffs' argument. The second boat is Beber's own sailboat, which did not come free of its moorings during the storm. Nonetheless, there is no evidence in the record that Beber's boat was moored any differently than the TRUST ME II, and given that both boats were prepared for the storm by the same person, it seems unlikely that they were moored differently. Moreover, Beber's boat did not remain "moored" in any meaningful way; it was dismasted, cut in half, and sunk, along with its dock. In the absence of any evidence about how it was tied down, we cannot say that Beber's boat, which sank to the bottom of the canal and thus was subject to different wind and wave forces, is a suitable comparison to the TRUST ME II, which remained afloat. Rather, it is merely good evidence of the overwhelming force of Hurricane Katrina and the devastation that it inflicted on the docks and boats near the TRUST ME II.

The third and fourth boats are powerboats owned by Plaintiffs' neighbor, Johnny Robertson. Neither powerboat left its moorings during the hurricane. Plaintiffs contend that the powerboats remained in their original locations because they had been tied parallel to the canal, not perpendicular to the canal like the TRUST ME II. This argument is not persuasive. First, the powerboats were over a half-mile away from, and further inland than, the TRUST ME II. As a result, they likely faced different weather conditions. Second, both boats were smaller than the TRUST ME II, and neither boat was a sailboat and thus did not have masts and rigging, which are two features that make sailboats especially susceptible to hurricane-force winds. Third, there is no evidence that sailboats in general or the TRUST ME II in particular could have been tied parallel to the canal or that there was room in the canal or marina for the TRUST ME II to be tied parallel to the canal. Nor is there any evidence that any other sailboat in the area that had been tied perpendicular to the canal before the storm was tied parallel to the canal in preparation for the storm. Therefore,

No. 10-30433

the powerboats are too dissimilar to the TRUST ME II to create a genuine issue of material fact.

As the district court correctly pointed out, "the purported disputed issues of fact raised by the plaintiffs are nothing more than hindsight speculations about what could have been done, not facts which disprove defendant's evidence that she exercised reasonable care under the circumstances."  Likewise, none of the arguments raised by Plaintiffs undermine our fundamental finding that, given the strength of Hurricane Katrina and the widespread devastation it inflicted upon the docks and boats in the area near where the TRUST ME II was moored, Berglin and her agents' actions or omissions, even if negligent, had no effect on the TRUST ME II coming loose.

## IV.  CONCLUSION

The district court's grant of summary judgment is AFFIRMED.

11