WILSON v. CHARLESTON PILOTS' ASS'N et al.

(District Court, E. D. South Carolina. July 8, 1893.)

1. PILOTS—LIABILITY—TUG AND SCHOONER.
   A pilot engaged to take a schooner under tow to sea is liable for any damage resulting to the schooner from his negligently taking his place upon the tug instead of on the schooner, although he does so at the request of the master of the schooner.

2. SAME—ORDINARY DILIGENCE.
   A pilot is not liable for damage to the vessel in his charge unless caused by his failure to use ordinary diligence, i. e. the degree of skill commonly possessed by others in the same employment.

3. SAME—FAILURE OF MASTER TO OBEY PILOT'S ORDERS.
   A pilot engaged to take a schooner to sea from the harbor of Charleston, S. C., stationed himself on the tug, and ordered the schooner to follow the tug closely. On reaching the Swash channel the tug headed S. E., (the wind being S. W., and the current from south to north,) thereby properly proceeding down the channel S. E. by E. ⅜ E., and on the south side thereof. The schooner had raised her mainsail and jibs by order of the pilot, but now, without orders, raised her foresail, and bore off to the north side of the channel, where she grounded. The wind was fair enough to take the schooner out by her sails alone. *Held*, that the pilot was not liable.

4. TOWAGE—LIABILITY OF TUG—NEGLIGENCE OF TOW—END OF CONTRACT.
   The master of a schooner knowingly engaged a tug of inferior power to tow him to sea from Charleston harbor. In passing down the Swash channel, the schooner being under sail, with a breeze sufficient to take her to sea without the aid of steam power, she negligently ran aground on the north side of the channel, and thereafter negligently lowered her mainsail, making it impossible for the tug to get her off. *Held*, that the tug did not contribute to the accident, and was not liable for any further service under the contract of towage.

In Admiralty. Libel by Samuel P. Wilson, master of the schooner Kate V. Aitken, against the Charleston Pilots' Association and others, for negligence resulting in the loss of the schooner while

in the charge of one of respondents' agents. Exceptions to the libel were overruled. 55 Fed. Rep. 1000. Libel dismissed.

Bryan & Bryan, for libelant.

Smythe & Lee and J. N. Nathans, for respondents.

SIMONTON, District Judge. This is a libel in personam against the members of the Charleston Pilots' Association (not incorporated) and the owners of the steam tug Relief. It was brought by the master of the schooner Kate V. Aitken, which grounded on the bar of Charleston, while leaving that port, in tow of the Relief, and in charge of S. G. Bringloe as pilot, and a member of and designated for that duty by the Charleston Pilots' Association. She became a total loss. The case has taken a wide range. To understand it in all of its aspects, the facts must be stated in detail.

No person can engage in the business as pilot on the bar and harbor of Charleston unless he possesses a commission or license for that purpose from the state, called a "branch." This license is granted to a number limited by law, after tests of the fitness of the applicant, the execution by him of a bond, and his qualification on oath. Gen. St. S. C. § 1260 et seq. The rate of compensation is fixed by law. Pilotage is compulsory on all vessels coming from other than home ports. The duties of pilots are carefully laid down. The reason for the existence of this privileged class is to secure safety to vessels entering or departing a port. Up to a recent period there were engaged in this service on this bar from 10 to 12 vessels, owned by different persons, and the pilots in these vessels cruised for long distances to the northward, southward, and eastward, stimulated by competition. For the purposes of mutual convenience, increased profit, decrease of expense, and diminution of toil and exposure the pilots formed the association, and adopted printed articles of agreement. Three pilot boats, and none other, are used in this service by all the pilots. They are hired by the association, which also victuals and mans them. A certain number of pilots do duty in rotation on these vessels, watching for and piloting in inward-bound vessels. The bill for this service is made out in the name of, and the money is paid to the Charleston Pilots' Association. When a vessel is ready for sea she is not taken out, as formerly, by the pilot who brought her in, or by some pilot substituted by him, but by a pilot designated by the association. The association has a regular office rented by it, where are the president and secretary and treasurer. A roster is kept in this office of the pilots, members of the association, and their tours of duty, presumably made out by, or under the direction of, or with the acquiescence of, the president. Outward pilotage is paid to the association, and all moneys earned by pilotage are deposited in a common treasury, in the name of the association. Each month the expenses of the boats, salaries, rents, and all common expenditures are paid out of this common fund. The net result is divided equally among the active members of the association. One of the questions made in the case is, is this association a copartnership,

and as such responsible for the loss of this schooner while in charge of Mr. Bringloe? This will be disposed of hereafter.

The Kate V. Aitken, a three-mast schooner of ———— tons, entered the port of Charleston with a cargo of coal on 26th February last, in charge of Mr. Aldert as pilot, a member of the pilots' association. A bill made out in the name of this association for the pilotage was presented to and paid by the schooner on that day. She discharged cargo, and went up Ashley river. Taking in a cargo of dry phosphate rock, she was towed down by the tug Relief on 8th March, and anchored off the battery. Her master sent notice to the office of the pilots' association of his intention to go to sea, and S. G. Bringloe was designated as pilot to take him to sea. About 9 o'clock A. M. of the 9th March the pilot boarded the schooner from the tug Relief. This tug had been engaged by the schooner. Her master would have preferred a larger tug, and endeavored to employ one; but, owing to some courtesy existing between her tug master and the Relief, he found himself without choice on that day. Anxious to get to sea, he made no further objection to the Relief. When the pilot boarded the schooner he asked her master whether he preferred the pilot to be on the tug or on the schooner. It seems that it was the usual practice to put the pilot on the tug, unless the master of the vessel otherwise wished. On this occasion the master quickly and emphatically expressed his preference that the pilot should be on the tug. Perhaps it is well to say in passing that if disaster occur because the pilot is on the wrong boat he cannot excuse himself by reason of any preference of the master. He is employed because of his supposed knowledge of all that is necessary to take a vessel to sea. The pilot then went to the tug, after giving instructions as to the paying out the hawser to be used as a tow line. He specially directed that the hawser be passed over the port, which was the lee bow, and that the tow should follow the movements of the tug strictly. During the night before there had been a heavy blow. When the tug and her tow started there was a good breeze blowing from the south and west. From this it was evident to the pilot that when they were crossing the bar they would have the wind abaft the beam, and at the same time would encounter a current moving athwart the channel. The velocity of this current was about one to one and a half knots per hour. Presumably because he knew this, the pilot ordered the line to be passed over her lee bow, so that her head should be kept to windward. The day was bright and clear, the wind moderate enough, blowing from S. W. by W., growing more fresh as they approached the ocean. The tow line was about 70 fathoms,—420 feet; the schooner was 125 feet long, and the tug was 66 feet. The tug and tow proceeded towards the bar. The master of the schooner took sole charge of the wheel, and remained at it, keeping her well aft of the tug. After they had passed Ft. Sumter the schooner raised her mainsail and jibs by order of the pilot. They passed through the jetties at the top of the high water, and entered the Swash channel, the speed over the ground being four miles an

hour. The exit of this channel is a straight cut, dredged out by the government, about 90 or 100 feet wide and ——— feet long. Its course is S. E. by E. ⅜ E. On the north side of the channel the banks of sand descend abruptly to the channel. On the south side they shelve gradually. The day mark of the channel is the, range of Ft. Sumter light house with St. Philips Church steeple in Charleston. The north side of the channel is in a line with the northeast angle of the fort and the steeple. The south side of the channel is in the line with a mark on the fort and the steeple. When the tug entered this narrow part of the channel, the pilot, who had been closely watching the tug and tow, and giving directions constantly to the former, standing upon the top of the house, saw that the schooner seemed to be following him properly, as, indeed, she had been doing all the time. He was then proceeding down the channel. As he was encountering a current athwart his course, and had the wind on his starboard beam, he put the head of the tug, as he says, to S. E. by S., or, as the tug master says, to the S. E., so that by the resolution of forces he could go in the direction of the channel S. E. by E. ⅜ E. At that point the pilot put his glass up, in order more carefully to observe the range, and see that he was keeping it. He had the tug well on the south side of the channel, possibly a little south of it, and, as we have seen, the tow following him. After he had observed the range with his glass, and seeing that he had the steeple well to the south of the mark on the fort, he took the glass down, looked at the schooner, and found that she was over his port quarter on the north side of the channel, and, the instant after, the tow grounded on the bank. Just before this the master of the schooner, without orders from the pilot, hoisted his foresail, and as soon as he struck, —likewise without orders,—he lowered his mainsail. He had, he says, carefully followed all the movements of the tug, and had obeyed all orders of the pilot up to that time. When she grounded he for the first time observed the range, and found her outside of and north of the channel. When the schooner grounded, the wind and the swell put her further up on the shoal. She resisted all the efforts which the tug at once put forth to get her off. Soon after she bilged, was deserted, and became a total wreck.

The tug Relief had towed the schooner on the day before the accident down Ashley river to her anchorage, and was well known to libelant. She is a small tug, quite old,—thirty-odd years,—and her propeller was worn. She had lost power. But she was regularly employed in towage, and carried vessels to sea quite as large as or larger than the Aitken. She had power enough for this purpose. But she probably did not have sufficient power to pull the schooner that day off that shoal. Perhaps she was not put to a fair test on that occasion. When the master lowered his mainsail and left his jibs up, his heel being aground, he drove her head up on the shoal as on a pivot, and counteracted all efforts of the tug to pull her off. The Confidence or the Hercules, two large tugs of that port, might either of them have done this. But the

master was not obliged to go to sea with the Relief, and he knew when he employed her that she was smaller than and had not the power either of the Confidence or the Hercules. Still he employed her. The libel charged her want of power as a fault contributing to the accident as thereby being unable to perform the towage contract.

The questions in this case are: Is the pilot, S. G. Bringloe, responsible in damages for this accident? If so, is the Charleston Pilots' Association, of which he is a member, responsible for his acts? Did the tug contribute to the accident?

1. Is the pilot responsible in damages for this accident? He was in control of the movements of the tug and of the tow. Macl. Shipp. 277. He was charged with the safety of the schooner, and of all that she carried, being bound to use due diligence and care and reasonable skill in the exercise of his important functions. He is answerable if the schooner suffered damage through his default, negligence, or want of skill, while her helm was under his control. Id. 278. He was not an insurer, and is only chargeable for negligence if he fail in due knowledge, care, or skill in avoiding obstructions known or which should have been known to him. The Margaret, 94 U. S. 496; The James A. Garfield, 21 Fed. Rep. 475. If he used his best judgment and skill in avoiding known dangers, he cannot be held liable, although the result may show that this judgment was wrong. Mason v. Ervine, 27 Fed. Rep. 459; Campbell v. Williamson, 1 Phila. 198. "It is settled that if the occupation be one requiring skill, the failure to exert that needful skill, either because it is not possessed or from inattention, is gross negligence." Curtis, J., in The New World v. King, 16 How. 469. An eminent text writer, whose name is authority, lays down the principle:

"Every man who offers his services to another, and is employed, assumes to exercise in the employment such skill as he possesses, with a reasonable degree of diligence. In all these employments where peculiar skill is requisite, it one offer his services he is understood as holding himself out to the public as possessing the degree of skill commonly possessed by others in the same employment, and if his pretensions are unfounded he commits a species of fraud on every man who employs him in reliance on his public profession. But no man, whether skilled or unskilled, undertakes that the task he assumes shall be performed successfully and without fault or error. He undertakes for good faith and integrity, but not for infallibility; and he is liable to his employer for negligence, bad faith, or dishonesty, but not for losses consequent on mere error of judgment." Cooley, Torts, 647.

This is the law of this case. Did this accident happen because the pilot failed to exert needful skill, either because he did not possess it or from inattention? Did he display negligence, bad faith, or dishonesty? Assuming, for the sake of the argument, that he occasioned the accident, was it consequent on his want of skill, negligence, bad faith, or dishonesty, or on a mere error of judgment? Mr. Bringloe has been in the practice of his business as a pilot on this bar for over 40 years. He is hale and vigorous, and in full possession of his faculties. He has always borne

an excellent reputation for caution and skill as a pilot, and his habits are steady. He frequently sounds and knows the bar, and is well acquainted with this new channel. On the day of the accident all the testimony shows that he was alive and vigilant, constantly attentive. He began by putting the tow line on her lee bow, thus aiding her head to the wind and current. He put up her mainsail to the same end, just before they were about to encounter the current. The wind being fair,—fair enough to take the schooner out by her sails alone,—he thus aided any defect of power in the tug. He kept himself on a prominent lookout on the tug the whole way, and observed all the movements of the schooner. At the moment of the accident he was watching and verifying the range by the landmarks. There is a total absence of evidence tending to show want of knowledge, want of care, or want of skill, or bad faith, except the fact of the accident itself. This is not a case in which the fact of the accident is conclusive of the cause. If the grounding arose from the act of the pilot, it was by an error of judgment. The distinction between an error of judgment and negligence is not easily determined. It would seem, however, that if one assuming a responsibility as an expert possesses a knowledge of facts and circumstances connected with the duty he is about to perform, and if he brings to bear all his professional experience and skill, weighs these facts and circumstances, and decides upon a course of action which he faithfully attempts to carry out, the want of success, if due to such course of action, would be attributed to error of judgment, and not to negligence. But if he omits to inform himself as to facts and circumstances, or does not possess the knowledge, experience, or skill which he professes, then, if failure is caused thereby, this would be negligence. The Tom Lysle, 48 Fed. Rep. 693. But it does not appear that the accident was occasioned by an error of judgment on the part of the pilot. He took position on the tug in accordance with the custom of the pilots of this bar. Some of them testifying in this case say that it is the most proper position for the pilot, and the libelant concurred in this opinion. When the pilot left for the tug he instructed the libelant to follow him, and watch closely his movements. The libelant, a skillful and experienced seaman, master of the schooner, took and kept the wheel. He showed that he understood his instructions by following them out correctly down to the Swash channel. All the witnesses agree in this. When in this channel the tug was well over on its south side. Owing to the wind from the S. W., and the current from S. to N., the tug was heading S. E., or S. E. by S., and under the resolution of forces she was actually proceeding down the channel S. E. by E., ⅞ E. The proper place for the tow, if she obeyed instructions, was also on the south side of the channel, and, regulating her movements by those of the tug, she should have headed S. E., or S. E. by S., and so acted upon by two forces she would have followed the tug in the direction she was actually going, down the channel, going over nearly the same ground, holding a weather position,

and giving ample room for leeway. This was her position and direction just before the accident, for when the pilot observed her immediately before this he saw her over the starboard quarter of the tug. When he took down his glasses and looked at her he found that she was bearing off the port quarter, on the north side or beyond the north side of the channel, and then she got aground. How this occurred can only be conjectured. It may have been owing to the fact that by the raising of the foresail the schooner got improper leeway, or perhaps the rising sail obscured the vision of the master at the wheel, and so prevented him from keeping the schooner well up. Whatever may have been the cause, one thing seems most probable: that obedience to the order of the pilot did not cause it. It does not appear that the pilot is responsible in damages for the accident.

2. The conclusion reached on this first point renders any discussion of the liability of the Charleston Pilots' Association unnecessary. No opinion is expressed upon the nature of this association, whether it be a copartnership or not.

3. Did the tug contribute to the disaster? She was under the control and direction of the pilot, and obeyed all orders which he gave. Up to the moment of the disaster she had pulled the schooner successfully against a flood tide, and they had attained a speed of four miles an hour over the ground, both being completely under control. There could not have been displayed any want of power, as she was aided by the schooner under sail, in a breeze which could have carried her to sea without any aid of steam power. It must be noted that the schooner did not merely touch bottom in the channel, as vessels often do, and pass on. She struck a shoal outside of the channel. From the configuration of the bottom at that point this shoal descended abruptly to the channel, forming so to speak a bluff under water. When the schooner stranded on this shoal, the tug could not pull her off. And if she could have done so under ordinary circumstances, the master of the schooner made it impossible by hauling down his mainsail. The towage services ended at this juncture. If the tug had rendered any other service it would have been in the nature of salvage. No fault can be imputed to the tug.

The libel is dismissed.