**UNITED FRUIT COMPANY, a Corporation, Libelant,**

v.

**MOBILE TOWING & WRECKING COMPANY, Inc., a corporation; Mobile Harbor Pilots Association, an unincorporated association; Mobile Harbor Pilots Association, a corporation; and Percy Manders, Jr., Respondents.**

**UNITED STATES of America, Libelant,**

v.

**THE VERAGUA, her engines, boilers, tackle, and apparel, in rem**

and

**United Fruit Steamship Corp., in personam, Respondent and Petitioner (Mobile Towing & Wrecking Company, Inc., and Percy Manders, Jr., Impleaded-Respondents).**

Nos. 2558, 2588.

United States District Court
S. D. Alabama, S. D.
Sept. 30, 1959.

Thomas E. Twitty and Thomas E. Twitty Jr., of Inge & Twitty, Mobile, Ala., for United Fruit Co.

Ralph Kennamer, U. S. Atty., Alfred P. Holmes, Jr., Asst. U. S. Atty., Mobile, Ala., for the United States.

C. B. Arendall, Jr., and T. Massey Bedsole, of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for Mobile Towing & Wrecking Co.

Percy Manders, Jr., in pro. per.

THOMAS, District Judge.

This is a consolidated action in Admiralty, involving two different suits and a Fifty-Sixth Rule Petition, 28 U.S.C.A., arising out of events which occurred on the night of November 22, 1954, on the east side of Mobile River, when the United Fruit Company's S.S. Veragua, while shifting in Mobile Harbor, touched up against a moored vessel, the S.S. Silver Mariner, owned by the United States of America. United Fruit Company, seeking recompense for damages suffered by the Veragua, brought its libel, *in personam*, against Mobile Towing & Wrecking Company, Inc., whose tugs were involved, the Mobile Harbor Pilots Association, and one of the Association members, Captain Percy Manders, Jr., who was aboard the Veragua handling the shifting movement (Case Number 2558). The United States of America, claiming minor damages to the Silver Mariner, then proceeded in a separate action against the Veragua, *in rem*, and United Fruit Company, *in personam* (Case Number 2588). United Fruit Company thereupon impleaded Mobile Towing and Captain Percy Manders, Jr., reasserting its previous contention that any liability should be borne by the tugboat company as owner of the tugs, and Captain Manders. The notably minor damages to both vessels not being seriously contested, and the Silver Mariner's freedom from liability being stipulated, these consolidated cases are before the Court primarily on the question of which of the various respondents should bear the loss.

The issues of fact and law came on to be heard on the pleadings, stipulations and proofs of the parties; and the Court, having considered the same, and the law applicable thereto, now makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Libelant United States of America, at all times pertinent, was the owner of the Silver Mariner, a general cargo vessel, 564 feet long, with an 80 foot beam.

United Fruit Company (Libelant-Respondent and Petitioner under the 56th Rule), at all times pertinent was the owner of the Veragua, a ship over 400 feet long with a 60 foot beam. Respondent-Impleaded Respondent, Mobile Towing, at all times pertinent was the owner of the tugs Joseph M. Walsh, Richard Walsh and Commander; being the three

tugs involved in the movement of the Veragua. At such time, Captain Percy Manders, Jr., also a Respondent and an Impleaded Respondent, was a Mobile Harbor Pilot of more than eleven years experience in this port, duly licensed by the United States of America and the State of Alabama, a member of the Mobile Harbor Pilots Association, and an authorized Deputy Harbor Master in the Port of Mobile.

On the evening of November 22, 1954, the Silver Mariner was moored portside to the south of Pier J, of the Alabama Dry Dock & Shipbuilding Company, on the east side of the Mobile River. The Silver Mariner's berth was in a slip, running east and west, perpendicular to Mobile River, bounded on the north by Pier J, on the south by Pier K, and such slip was 190 feet in width. United Fruit's local office had requested Mobile Towing to furnish the services of three tugs to assist in shifting the Veragua from its berth on the west side of Mobile River, downstream to a berth on the north side of Pier K, across the slip from where the Silver Mariner was moored. The tug services were furnished and accepted in accordance with Mobile Towing's Schedule of Rates, pursuant to which it was agreed that the tugs would furnish motive power under the orders, supervision and control of the person directing the movement of the said vessel.

Under the practice prevailing in the Port of Mobile, which differs from that followed in many other ports, tug Masters do not go on the bridge of the ship to be assisted, and there, as pilot, assume the direction and control of the flotilla. On the contrary this function is performed in Mobile by one of the members of the Mobile Harbor Pilots Association, who is a Deputy Harbor Master, and whose turn it is to take the next call. As is customary, the services of a Harbor Pilot had been requested by United Fruit to direct the shifting of the Veragua. It being Captain Manders' turn, he reported to the Veragua to conduct the shift. He was not an employee of Mobile Towing.

In response to the request for tug assistance, Mobile Towing's tugs Joseph M. Walsh, Richard Walsh and Commander were alongside the Veragua at about 7:30 p. m. Shortly before 8:00 p. m., with the assistance of the tugs, pursuant to the orders of Captain Manders, the Veragua was undocked, turned around and headed south and downstream. At this time the Veragua was a "dead" ship, having no motive power of her own. However, throughout the entire movement in question, the Veragua was manned by her regular officers and crew, and her Master was at all times on the bridge with Captain Manders, the Harbor Pilot. The Joseph M. Walsh was lashed up to the port quarter of the Veragua. The Commander had a line over her bow. Shortly after being headed downstream, the Richard Walsh was positioned under her port bow.

Having moved downstream in Mobile River to a point approximately opposite the slip in which the Veragua was to be berthed, the Veragua was turned to port pursuant to the orders of the Harbor Pilot, preparatory to entering the slip. At this time, there was a flood tide, and the wind was from the north-northwest at about eight miles per hour. Visibility was good.

As the turn into the slip was made, Pilot Manders made allowance for the wind and tide, which tended to offset one another; and the Veragua was proceeding into the slip, according to all the evidence, very nicely. At this time, with the stern of the Silver Mariner extending a few feet beyond the pier to which she was moored, the beam of the Silver Mariner obstructed some 80 feet or more of the slip. This left only about 110 feet, or less, of open water in which to maneuver the Veragua, over 400 feet in length, with a 60 foot beam. The Veragua was light and therefore more easily susceptible to the action of the wind and tide. As the tow was being worked into the slip, the Harbor Pilot gave various

orders to the three tugs, which were still made up to the Veragua in the manner stated above. The Harbor Pilot had placed the Commander out front with a line over the Veragua's bow, to pull the bow of the vessel around and into the slip. The Harbor Pilot had the Richard Walsh under the port bow with a line up. The Harbor Pilot had the tug Joseph M. Walsh lashed up under the port quarter primarily for the purpose of utilizing that tug's power in moving ahead and backing.

The movement into the slip was not accompanied by any excessive speed. Before its completion, the Harbor Pilot and the Veragua's Master, both on the bridge of the tow, noticed that the Veragua was setting up with the tide toward the moored Silver Mariner. Captain Manders testified that this was caused by the fact that the wind lay after the movement into the slip began, leaving the flood tide to set the Veragua up toward the Silver Mariner. However, it was not immediately apparent that the Veragua would actually touch the other vessel. Whether or not the wind lay, the evidence is uncontradicted that this was a movement in close quarters and the Veragua touched against the starboard quarter of the Silver Mariner. A true picture of what first appeared would be a "narrow miss", in close quarters, developed into what can be more appropriately called a "touching" than a "collision". Captain Magann, Master of the Veragua, with rather convincing frankness stated that in such circumstances it was "kind of hard to state the time between you know she's going to touch and you think she's going to be all right". The Court finds such to have been the fact, and further finds that when it finally was apparent to those on the bridge of the Veragua that she would fetch up against the Silver Mariner, instead of slipping by, there was nothing that anyone could then have done but to allow the Veragua to land against the Silver Mariner as lightly as possible. This was done with two of the lifeboat davits and a portion of the Ver-

agua's rail in between, touching the starboard quarter round of the Silver Mariner. Damages to the Silver Mariner of $590 and to the Veragua of $1,368 are conclusive that whatever contact occurred, considering the size of the vessels involved, was ever so slight. Under such circumstances, the Court can accept as true the testimony of the tug Masters that they did not know that an actual touching had occurred until after the berthing was completed. In any event, the Harbor Pilot worked the Veragua away from the Silver Mariner and into her berth with no further damage.

The proximate cause of the contact between the vessels is almost impossible to determine. Perhaps it was an error in judgment on the part of the Deputy Harbor Master. If so, it was nothing more.

The tugs obeyed all the orders of the Deputy Harbor Pilot and performed all of their movements satisfactorily. The services of the tugs were limited to furnishing tug power pursuant to the orders of the one in charge of the movement, and this they did.

### Discussion

The parties having stipulated that the Silver Mariner was properly docked and showing proper lights, she was nowise at fault. The United States seeks to implicate the Veragua and her owner, the United Fruit Company, only. It is the latter that seeks to lay the responsibility for all of the damage, minor though it be, upon the Deputy Harbor Master and Mobile Towing, claiming that joint negligence of both proximately caused the maritime mishap here before the Court.

The Court finds no difficulty in its conclusion that Mobile Towing is to be exonerated. It is not liable as owner of the tugs, for the simple reason that they were not negligent. The Towing Company did not guarantee that the movement would be made entirely without mishap, the tugs being liable only for negligence on their own part, and there has been no showing of tug negli-

gence. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. As a matter of fact, it affirmatively appears from all the evidence that none of the tugs was negligent. The tugs carried out the orders of the Deputy Harbor Pilot, and did so in a proper manner. This is all that was required of them. Sturgis v. Boyer, 24 How. 110, 65 U.S. 110, 16 L.Ed. 591; In re Walsh, 5 Cir., 136 F. 557; The Beaverton, D.C.N.Y., 273 F. 539; The Stella, 5 Cir., 278 F. 939; Old Time Molasses Co. v. United States, 5 Cir., 31 F.2d 963. Accordingly, the Towing Company can be eliminated from the further discussion of this case. The conclusion to exonerate the Towing Company does not necessarily constitute a finding that the Harbor Pilot was likewise free from fault. This for the reason that the Towing Company was not responsible for the acts of the Harbor Pilot.

The Mobile Harbor Pilots Association is not liable under any theory. It is not responsible for the Harbor Pilot's acts. Guy v. Donald, 203 U.S. 399, 27 S.Ct. 63, 51 L.Ed. 245; Mobile Bar Pilots Ass'n v. C. I. R., 5 Cir., 97 F.2d 695.

The United States is entitled to recover the amount of its damages from someone. What has been said above leaves only the Veragua, and its owner, and Captain Percy Manders, Jr., upon whom the damages to both vessels could fall.

The immediate approach to the question of who should pay the United States is made easy because of a long recognized and well-known presumption. The Veragua and her owner are met with the presumption that the moving vessel was at fault. The Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; The Granite State, 3 Wall. 310, 70 U.S. 310, 18 L.Ed. 179; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; Coello v. United States, D.C.La.1925, 9 F.2d 931. Mr. Justice Grier stated the rule in The Louisiana, supra, as follows:

" * * * she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major*, which human skill and precaution, and a proper display of nautical skill, could not have prevented."

Such presumption can be wholly overcome only by proof that the moored vessel was solely at fault, that the moving vessel was without fault, or that the collision resulted from an inevitable accident. Carr v. Hermosa Amusement Corp., Ltd., 9 Cir., 1943, 137 F.2d 983; The Clarita and The Clara, 23 Wall. 1, 23 L.Ed. 146; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943.

Applied to the case at bar, where does this leave the Veragua? The Silver Mariner's freedom from fault is not questioned. The proof in this case does not rise to the point of showing the Veragua entirely free of fault, or the accident to have been inevitable. Accordingly, the Veragua and her owner are met with the consequences of failing to sustain the burden of overcoming the applicable presumption. The Morning Light, 2 Wall. 550, 69 U.S. 550, 17 L.Ed. 862. It necessarily follows that unless all or a portion of the Silver Mariner's damages can be charged to Captain Manders the entire amount must fall upon the Veragua and United Fruit Company.

If this occurrence were the result of Captain Manders' negligence, he would be liable, at least for part of the damages to both vessels. As a Deputy Harbor Pilot he is under a duty to exercise that degree of care and skill possessed by the average member of his profession. The Dora Allison, D.C.Ala. 1914, 213 F. 645; The Sylfid, D.C.Ala. 1905, 169 F. 995, affirmed 5 Cir., 176 F. 1022. In this case the Harbor Pilot's job was to navigate the Veragua into a narrow slip lying perpendicular to the channel down which he had come. The presence of the Silver Mariner, already moored on the north side of the slip, left enough room for the intended movement

to be accomplished, but at best it was a close situation. While not more than normally hazardous in the Port of Mobile, nevertheless the maneuver was one that called for the skill and knowledge reasonably to be expected of a Mobile harbor pilot under the same or similar circumstances.

The evidence is that Captain Manders had the skill and knowledge ordinarily possessed by others in his profession. Even though damage to his vessel resulted, he is not liable unless "caused by his failure to use ordinary diligence, i. e. the degree of skill commonly possessed by others in the same employment". Wilson v. Charleston Pilots' Ass'n, D.C.S.C.1893, 57 F. 227. Here again the burden is upon the United Fruit Company to satisfy the Court that what occurred did occur as a result of some lack of such required knowledge or skill on the part of Captain Manders, or his failure to exercise such. The Court is of the opinion that this burden has not been met.

The mere fact that a different course of action might have avoided a collision is not enough to condemn Captain Manders to legal liability. Captain Manders' decisions to handle the movement as he did, though wrong, judged by the result, do not require him to be held liable, if his decisions were those which a competent harbor pilot similarly situated might reasonably have made under the same circumstances. The law requires due care and skill, but not infallibility.

The evidence, both by deposition and *ore tenus,* has been carefully and thoroughly considered by the Court. I do not view the evidence as rising to the point of showing negligence on the part of Captain Manders. At most, the Harbor Pilot may have been guilty of an error of judgment. However, scarcely that appears except from the fact of the collision itself.

The obvious normal hazard of navigating in close quarters was known by United Fruit. Ulster Oil Transp. Corp. v. The H. A. Meldrum, D.C.N.Y., 122 F.Supp. 767, affirmed 2 Cir., 229 F.2d 568. The Harbor Pilot did not undertake to guarantee that he could get the Veragua into the slip without "even bending a fender". His duty was to perform the maneuver non-negligently. United Fruit Company shows damage to its own ship and that of the United States. Further than that it has failed to sustain the burden of proof. Therefore, it cannot recover any part of the damages from Pilot Manders.

Conclusions of Law

1. The subject matter of this suit, a marine collision, and the parties hereto, are within the admiralty and maritime jurisdiction of this Court.

2. Libelant United States is entitled to a decree to sustain its claim for its damages against the Veragua *in rem.*

3. Both United Fruit Company's libel and its 56th Rule petition against Mobile Towing & Wrecking Company are due to be dismissed with costs.

4. United Fruit Company's libel against Mobile Harbor Pilots Association, sued both as an unincorporated association and as a corporation, is due to be dismissed with costs.

5. Both United Fruit Company's libel and its 56th Rule petition against Captain Percy Manders, Jr., are due to be dismissed with costs.

Decree in accordance herewith.