**KINGFISHER SHIPPING CO., LTD., Plaintiff,**

v.

**M/V KLARENDON, her engines, boilers, tackle, apparel, etc., in rem, Third-Party Plaintiff,**

v.

**Charles A. SCHUESSLER, Third-Party Defendant.**

**Civ. A. No. H–85–1810.**

United States District Court, S.D. Texas, Houston Division.

Dec. 23, 1986.

James P. Cooney, Royston, Rayzor, Vickery & Williams, Houston, Tex., for plaintiff Kingfisher Shipping Co., Ltd.

F.E. Billings, Hinds Meyer, Billings & Solomon, Houston, Tex., for third-party plaintiff, M/V KLARENDON.

Michael C. Farrow and Peter A. McLauchlan, Clann, Bell & Murphy, Houston, Tex., for third-party defendant, Charles A. Schuessler.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McDONALD, District Judge.

### I. Introduction

Kingfisher Shipping Company, Ltd., Plaintiff, brought this civil action on February 6, 1985, in the United States District Court for the Southern District of Alabama, Southern Division, pursuant to Rule 9(h) and Supplemental Rule C of the Federal Rules of Civil Procedure. Plaintiff alleged that the M/V KLARENDON, Defendant and Third-Party Plaintiff, struck the M/V CAPE HOPE, a vessel owned by Plaintiff, and that this allision[1] resulted wholly from the fault and negligence of Defendant M/V KLARENDON. On April 12, 1985, by order of Senior United States District Judge David H. Thomas this action was transferred to the United States District Court for the Southern District of Texas. On August 16, 1985, Defendant filed a third-party complaint against Charles A. Schuessler, the pilot of the M/V KLARENDON at the time of the allision. At Docket Call, on April 28, 1986, counsel for Plaintiff and Defendant informed the Court that the claims between them had been settled.

The bench trial before the Court between Third-Party Plaintiff M/V KLARENDON ("the vessel") and Third-Party Defendant Charles A. Schuessler ("the pilot") began on September 17, 1986 and concluded on September 18, 1986. Both parties presented eyewitness and expert testimony regarding the events of February 1, 1985 the day the accident occurred as well as testimony regarding the condition of the vessel and the experience of the pilot. Pursuant to Rule 52, Fed.R.Civ.P., this Court enters its Findings of Fact and Conclusions of Law declaring the reasons for its conclusion that Third-Party Defendant Charles A. Schuessler bears no responsibility for damages resulting from the February 1, 1985 allision.

### II. Findings of Fact

1. The vessel is a British flag vessel having a length of 337.6 feet. On February 1, 1985, she was empty except for ballast and was berthed at Adams Terminal No. 9, Houston Ship Channel Mile 43 with her starboard side to the dock. At this point the Houston Ship Channel runs approximately from West to East.

2. Because she was empty the vessel was relatively light and had a lot of "sail area" (that is, much of her side was above the water).

3. The M/V CAPE HOPE was also berthed at Adams Terminal No. 9, starboard side to the dock, at a distance of approximately 150 feet from the bow of the vessel.

4. In order to navigate the waters of the Houston Ship Channel in a vessel such as the vessel involved here, it is necessary to engage the services of a licensed compulsory pilot.

5. The agent for the vessel contacted the Houston Pilot's Association and ordered a pilot. Third-Party Defendant, a licensed Houston pilot, was assigned to direct the vessel to the sea buoy from its place of rest astern of the M/V CAPE HOPE. Third-Party Plaintiff had no right to elect which pilot it was to use.

6. The pilot arrived at the vessel at 5:50 p.m.

7. At that time, the sky was cloudy, the temperature was cold, the visibility was good, and the wind was from the north at approximately 10 to 15 knots. The effect of this wind was to push the vessel towards the dock.

---

1. "[T]he running of one ship upon another ship that is stationary—distinguished from *collision*." *Webster's Third New International Dictionary* 56 (1976) (second definition).

8. Upon arrival onboard the vessel, the pilot and Captain Chiu I-Yuan ("the captain") considered the adverse weather and discussed obtaining a tug to assist the vessel from the dock. The pilot attempted to obtain a tug by calling his dispatcher, but tugs were not readily available.

9. A decision was reached that the pilot would attempt to undock the vessel without the aid of a tug.

10. The allision would not have occurred if a tug was used to assist the undocking of the vessel.

11. The pilot decided to direct the ship to proceed astern with only the inshore stern line held fast. This maneuver was meant to swing the bow of the vessel away from the dock so that it would point into the middle of the channel.

12. Although the pilot repeated this maneuver several times the bow of the vessel never attained an angle with the dock greater than thirty (30) degrees.

13. After these several attempts an outbound ship approached. As a result the engines were maintained at dead slow astern to hold the vessel in position until the outbound ship passed.

14. The outbound ship helped pull the bow of the vessel out into the channel (though still no more than 30° away from the dock). At this point the pilot requested half astern engines to assist swinging the bow of the vessel out into the channel as far as possible.

15. The pilot then reported to the captain that he thought they could leave the dock and that the stern line should be let go.

16. The captain was on the bridge during these and all subsequent maneuvers and was in ultimate command of the vessel at all relevant times.

17. As a licensed Houston Pilot, the pilot was an expert at undocking vessels in the Houston Ship Channel. Further, he had performed this particular undocking maneuver many times before in the Houston Ship Channel. However, the captain could have rejected the pilot's advice at any time.

18 Both the pilot and the captain should have been aware that if the stern line was released an allision with the M/V CAPE HOPE was inevitable.

19. Once the last line was released the vessel made very little progress out into the channel; the vessel mostly slipped sideways in the direction of the M/V CAPE HOPE.

20. As the vessel approached the M/V CAPE HOPE the pilot realized that the vessel's stern might not clear the M/V CAPE HOPE. The pilot ordered hard starboard rudder to attempt to get the stern away from the M/V CAPE HOPE. The pilot noted that the vessel still did not gain sufficient headway to clear the other vessel.

21. Soon thereafter, seeing an allision to be imminent, the pilot ordered stop engines.

22. A crane supporting brace, approximately 10 to 12 feet high and made of heavy 1″ heavy steel plate located on the starboard side of the vessel aft directly in front of the wheelhouse, struck the M/V CAPE HOPE side plating at the aft port quarter of the ship and punctured the plating just below the deck line of the poop deck.

23. The pilot performed various maneuvers in order to keep the vessel along the side of the M/V CAPE HOPE in such a fashion so that further damage to the two ships did not result.

24. Later on during the evening of February 1, 1985, the vessel was successfully undocked by the use of an assisting tug. The pilot piloted the vessel during this subsequent maneuver.

25. The owners of the M/V CAPE HOPE filed a lawsuit against the vessel in Mobile, and the vessel was seized on about February 6, 1985. The owners were required to arrange for security as a result of such seizure and the vessel was under seizure for two days.

26. The claim of the M/V CAPE HOPE was in the amount of $94,591.31 and was settled for $75,000.00. Third-Party Plaintiff's expenses for the above legal actions, including attorneys' fees, were $3,932.65.

27. All findings of fact that are conclusions of law are hereby adopted as such.

### III. Conclusions of Law

1. That this Court has jurisdiction over the parties and the subject matter of this suit pursuant to Rule 9(h) and Supplemental Rule C of the Federal Rules of Civil Procedure.

2. That a vessel which collides with another vessel which is tied to the dock is presumed to be at fault and liable to the stationary vessel for its damages resulting from such allision. *See The Louisiana*, 70 U.S. (3 Wall.) 164, 173–74, 70 L.Ed. 85 (1866). Further, a vessel is liable *in rem* for the negligence of its pilot. *See The Barnstable*, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1900); *Rali v. Troop*, 157 U.S. 402 (1895). Since the vessel was presumed to be at fault, and it was liable *in rem*, her owners properly settled with the Plaintiff herein.

3. Third-Party Plaintiff Laredo Steamship Co., Ltd. ("Laredo") claims that any damages sustained as a result of the allision between the vessel and M/V CAPE HOPE were caused by the negligence of Third-Party Defendant. The burden of proof in this regard rests with Laredo. *See United Fruit Company v. Mobile Towing & Wrecking Company, Inc.*, 177 F.Supp. 297, 301 (S.D.Ala.1959).

4. A compulsory pilot's decisions are not negligent if they are the decisions a competent compulsory pilot might reasonably have made under the same circumstances; thus, due care and skill is required of a compulsory pilot but not infallibility. *United Fruit Company v. Mobile Towing and Wrecking Company, Inc.*, 177 F.Supp. at 302; *American Zinc Co. v. Foster*, 313 F.Supp. 671, 682 (S.D.Miss.1970).

5. The object of establishing a compulsory pilot requirement is to secure protection of life and property by supplying a class of pilot better qualified than ordinary mariners to take charge of ships in places where, from local causes, navigation is attendant with more than common difficulty. *Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique*, 182 U.S. 406, 412, 21 S.Ct. 831, 834, 45 L.Ed. 1155 (1901); *Texaco Trinidad, Inc. v. Afran Transport Co.*, 538 F.Supp. 1038, 1043 (E.D.Pa.1982). Thus, a compulsory pilot must be held to an "unusually high degree of care." *Bunge Corporation v. M/V Furness Bridge*, 558 F.2d 790, 798 n. 6 (5th Cir.1977).

6. The rule that in actions at common law the shipowner is not liable for injuries inflicted exclusively by the negligence of a compulsory pilot does not exempt the shipowner from liability where negligence of the vessel's captain proximately contributed to the injury. *Jure v. United Fruit Co.*, 6 F.2d 6, 7 (5th Cir. 1925); *Navegacion Castro Riva, S.A. v. M.S. Nordholm*, 178 F.Supp. 736 (E.D.La. 1959) ("... the vessel cannot be abandoned to the pilot. The responsibility of the crew persists."); *Bunge Corporation v. M/V Furness Bridge*, 558 F.2d at 798 n. 6.

7. It is the duty of the captain to interfere with a pilot's orders in cases of danger which the pilot does not foresee and in all cases of great necessity. *The China*, 74 U.S. (7 Wall.) 53, 67–68, 19 L.Ed. 67 (1869); *Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1571–73 (11th Cir.1985) ("The district court found unequivocally that the circumstances surrounding the approach to the bridge made out such a case of great necessity that it was blatant negligence on the part of Captain Liu to allow the ship to proceed under the control of Pilot Lerro after Captain Liu became aware *or should have become aware* of the inevitable risk of accident." Emphasis added.); *see also Chesapeake Bay Bridge and Tunnel District v. Lauritzen*, 404 F.2d 1001, 1007 (4th Cir.1968); *Bunge Corporation v. M/V Furness Bridge*, 558 F.2d at 798 n. 6.

8. The captain should have intervened to prevent the undocking maneuver from being completed. Not only would the use of a tug—which the captain could and should have required—have prevented the allision, but Third-Party Plaintiff forcefully argued at trial that the inevitable failure of the undocking maneuver was readily apparent to an observer on the dock and should, therefore, have been, *a fortiori,* apparent to observers on the deck of the vessel. Thus, observing the maneuver from the deck, the captain should have intervened to prevent the maneuver from being completed. (This conclusion is made difficult by the pilot's insistence that the maneuver was sound and would have succeeded but for purported problems with the vessel's engines; however, this Court accepts Third-Party Plaintiff's version of the facts.)

9. An injured shipowner is entitled to be placed in the same position he was in prior to the allision. *Tug June S. v. Bordagain Shipping Co.,* 418 F.2d 306, 307 (5th Cir.1969). Even if repairs are never effected, an injured shipowner is still entitled to recover the estimated costs therefor. *Id.* at 307 (*citing United States v. Shipowners and Merchants Tugboat Co.,* 103 F.Supp. 152, *aff'd.,* 205 F.2d 352, *cert. denied,* 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353 (1953)).

10. All conclusions of law that are actually findings of fact are hereby adopted as such.

### FINAL JUDGMENT

For all of the reasons stated in the Court's Order of this same date, this cause of action is hereby DISMISSED.

THIS IS A FINAL JUDGMENT.