COMPANIA de NAVIGACION
PORTO RONCO, S. A.,

v.

S/S AMERICAN ORIOLE in rem and American Foreign Steamship Corporation and Todd Shipyard Corporation, in personam.

Civ. A. No. 75–257.

United States District Court,
E. D. Louisiana.

Aug. 2, 1976.

Robert B. Deane, New Orleans, La., for plaintiff.

Benjamin E. Smith, New Orleans, La., William A. Ransom, III, New Orleans, La., for intervenor.

Alfred M. Farrell, Jr., New Orleans, La., James B. Kemp, Jr., Richmond M. Eustis, New Orleans, La., William T. Foley, Jr., New York City, for defendant.

MITCHELL, District Judge.

This matter came on for trial on a former date on the issue of liability vel non before the Court sitting without a jury.

Suit was brought by Compania de Navigacion Porto Ronco, S.A. as owner of the S/S *Locarno* against the S/S *American Oriole, in rem*; her owner, American Foreign Steamship Corporation, *in personam*; and co-defendant Todd Shipyard Corporation, *in personam* for damages resulting from the striking of the moored *Locarno* by the free drifting *American Oriole*, after that vessel had broken adrift from Todd's wharf on January 10, 1975. Intervenors, C. H. Sorensen and Sonner, as owner of the anchored M/S *Aino*; A/S *Uglands Rederi*, as owner of the M/S *Danita*; Golden Chalice Steamship, Inc., as owner of the anchored M/S *Golden Chalice*; and Amstar Corporation, as wharf owner, at whose dock the *Locarno* was moored, also claimed against the *American Oriole* and Todd for damages resulting from the free drifting *American Oriole* striking the anchored vessels and the Amstar Wharf. American Foreign Steamship Corporation cross-claimed against co-defendant Todd for damages to its own vessel as well as for any amounts which it might be adjudged to be owing the others.

After hearing the testimony and considering the depositions and exhibits received in evidence, the Court, in oral findings, concluded that defendant Todd Shipyard Corporation was solely at fault. The Court now enters the following formal findings of fact and conclusions of law as required by Rule 52(a) F.R.C.P., in support of that decision.

## FINDINGS OF FACT

### I.

The *American Oriole*, owned and operated by defendant, American Foreign Steamship Corporation, is a dry cargo ship of U.S. registry, 492 feet in length, and 69.5 feet in beam. In her lightened state, the vessel's draft is 6 feet 1 inch at the bow and 16 feet 11 inches at the stern. By arrangement with Todd Shipyard Corporation, the *American Oriole* berthed at Todd's facility in New Orleans to undergo repairs and other work. Thereafter, the vessel was to lay-up as a dead ship for an indeterminate period. The *American Oriole* had recently returned from a lengthy foreign voyage and her owner was to await a further charter party for cargo.

## II.

The *American Oriole* arrived November 27, 1974, and was directed by Todd to its Lower Navy Berth No. 4. Her crew and officers were paid off and her log ended on that day. Thereafter, the *American Oriole's* main propulsion, auxiliaries and generators were shut down and secured and the vessel was placed in Todd's drydock.

## III.

On December 4, 1974, the *American Oriole*, without power and unmanned except for her master, Captain Carl Enstrom, was taken out of dry dock by tugs, with the assistance of Todd's docking master and a river pilot, and was secured at Todd's Lower Navy Berth No. 4. Captain Enstrom remained aboard during the tie-up; he went fore and aft in consultation with Todd's docking master and was satisfied with the arrangement and alignment of the lines. In view of the indefinite stay of the dead ship, in the oncoming winter months, Captain Enstrom suggested to the Todd docking master that additional lines be put out in the future. He considered the existing mooring lines sufficient for temporary mooring but not for a long lay-up. The docking master testified that two additional lines, fore and aft, were then put out.

## IV.

Repairs by Todd were continued while the vessel was in the lay-up berth. For owner's account, Vinson Guard Service was engaged for an around-the-clock security guard as gangway watchman, to prevent trespassing and theft. During this lay-up period Todd provided and charged for electricity, line handlers to adjust and put out mooring lines as necessary, and daily fire watch service whose duties included checking all mooring lines. Before returning to New York on December 11, the owners' port engineer, Raymond Butler, instructed the gangway watchman that if there was any difficulty, he should go to the red-painted emergency telephone near the gangway and call Todd authorities for assistance. As the port engineer departed, he made a slight adjustment in the mooring lines by taking up slack at the stern; Todd's ship superintendent and another workman assisted him in doing this.

## V.

Todd Shipyard's Lower Navy Berth No. 4 is at the extreme down-river end of the Todd properties. The *American Oriole* was moored port side to, near the downriver end of the wharf. Forward of her bow were two open berths; upriver, the M/S *Galaxias* was moored port side to, in lay-up status, with a skeleton crew aboard. At the stern of, and below the *Galaxias* running downriver along the open berths, was a section of several hundred feet of damaged wharf and planking, roped off by a guard rail. The damaged area, enclosed by the guard rail, lay several hundred feet upriver of the *American Oriole's* bow.

## VI.

The testimony adduced shows that the bow lines of the *American Oriole*, consisting of five separate leads, led forward some 40 feet to double bitts. Thereafter, along the offshore side of the wooden wharf, interspersed every 48 feet, were a series of cleats and double bitts, the last of which was approximately 79 feet from the down river end of the wharf. Forward and after spring lines of the *American Oriole* led to cleats and double bitts in the normal manner. The vessel's stern lines led across the wharf to bollards, at a near right angle, and a forward lead led to another set of bollards on the inshore side of the wharf.

## VII.

The *American Oriole* was berthed at Lower Navy Berth No. 4 on January 10, 1975. That morning the U. S. Department of Commerce, National Weather Service Forecast Office, New Orleans, Louisiana, issued "Severe Weather Statement(s)" pertaining to a tornado watch in a widespread area in south Louisiana, specifically including Orleans Parish where the Todd yard is located and predicting a line of thunder-

storms accompanied by heavy rain, possible hail and gusty winds. These severe weather statements were issued at 7:30 A.M., 8:45 A.M., 9:45 A.M., and 10:45 A.M., January 10, 1975. The 9:45 A.M. and 10:45 A.M. statements included the following:

"Some of the thunderstorms will be accompanied by wind gusts to near 70 M.P.H. and a possible tornado."

## VIII.

Todd's management was aware of the severe weather prediction in the early morning of January 10. Todd's general superintendent instructed the foreman of its labor department to check the *American Oriole* and put out any additional lines deemed necessary. The foreman passed the order on to the labor leaderman. However, the leaderman thought that he was checking mooring lines because of changes in the height of the river, and was unaware of the severe weather forecast. Assisted by his crew, they adjusted two spring lines with the use of a hand ratchet and chain, moved a line from a bitt which was leaning toward the river from the strain of three lines, and took the loose end of a mooring line already in use and placed a bight or loop over bitts on the dock already in use securing the vessel. The five leads of the ship's bow lines, leading 40 feet forward to a set of double bitts, were found in order and the Todd men departed at about 10:00 A.M.

## IX.

At about noon on January 10, in increased wind gusts, the Vinson Guard Service watchman reported via the emergency telephone that the gangway was being pulled away from the dock. He then took shelter from the rain in a near-by shed. Approximately 5 minutes later, when no assistance arrived, he made a second call. He was told that help was on the way but was given three separate numbers to call. Apparently, the first two calls were to the Todd guard at the main gate, and the three numbers he was given were connections to the office of the general superintendent. He made a third call and returned to the shed. The *American Oriole* was straining on her lines. As the watchman looked out, he saw that the bow had come free from the dock. The watchman testified that as his fourth and final call was being answered, he heard lines snapping as the vessel went completely adrift.

## X.

Todd's general superintendent, Noel M. O'Neil, testified that his clerk did receive an emergency call from the gangway watchman. O'Neil then made several unavailing calls to Todd personnel, including his rigger foreman, before contacting the general foreman. They obtained an automobile, donned rain gear and drove to Lower Navy Berth No. 4. However, the *American Oriole* had already broken free, as reported by the watchman whom they found on the dock. The general superintendent called the U. S. Coast Guard and for tug assistance.

## XI.

According to the logs of the three anchored ships, the *American Oriole,* drifting downriver, struck the *Aino* at 1240 hours, the *Danita* at 1244 hours, and the *Golden Chalice* at 1257 hours. Having drifted across the river, she then fell against the *Locarno,* which was moored to the Amstar wharf on the east bank. The *American Oriole* then collided with and did certain damage to the Amstar facility.

## XII.

Tugs arrived shortly thereafter and held the unmanned vessel to the bank. She was boarded by Todd personnel who spent the night aboard. Early on the following morning, Saturday, January 11, 1975, the *American Oriole* was boarded by Todd's assistant general manager and its general superintendent, who personally took charge of the emergency operation. The *American Oriole* was holed, had taken water and was listing. Later that morning, her owners' marine superintendent and port engineer boarded, having just arrived from New York City. The *American Oriole* was taken

in tow and drydocked at Todd. After survey, the repairs for damages sustained by the vessel in the series of collisions were put in hand to Todd. Separate itemized charges were made by Todd for the line handling done on the morning of January 10 in anticipation of heavy weather, for services of Todd's tug *Betty Pharr* following the breakaway, and for salvage and emergency services on January 10 and 11.

### XIII.

The relevant testimony establishes that the mooring lines originally placed out on December 4, 1974 included two bow lines, two bow breast lines, a bow spring line, a stern spring line, and four stern breast lines. The stern of the *American Oriole* was moored approximately 27 feet upriver from the lower end of the dock. Original plans of the dock, constructed in 1943, called for alternate double bitts and cleats at intervals of 48 feet along the outboard edge of the dock. However, the lowermost double bitt and the cleat immediately upriver from it were both missing, so the stern lines had been led to a double bollard on the inshore side of the dock about 48 feet upriver from the end of the dock and another inshore double bollard about 65 feet upriver from the lower double bollard, both forward of her stern. There were no stern lines leading aft. The only line preventing the vessel from moving or swinging forward was the forward spring line, the only line leading aft.

### XIV.

According to the expert testimony of Captain David Wheat, a licensed master mariner, Mississippi River Pilot, and President of the Crescent River Port Pilot Association, and Captain John Munday, master mariner and retired Coast Guard Captain, the mooring lines securing the *American Oriole* on January 10, 1975, were inadequate to secure a dead ship, without crew and without power, for an extended mooring. In addition to those lines put out by Todd, there should have been heavy wire cables, known as insurance cables, one or two each

at the bow and stern leading to additional mooring devices on the dock or bank. In the face of the severe weather forecasts, additional rope lines should have been put out to independent bitts or bollards and one or both of the vessel's anchors should have been dropped to prevent her from blowing or drifting away in the event the moorings failed.

### XV.

Following recovery of the *American Oriole* after breakaway, her bow lines were found to have been neatly flaked down on the forecastle head. The spliced eyes which had been lead over the double bitts were found intact, as well as the bow lines themselves. Along the offshore side of the wharf, remnants of an intact spliced eye and a bight were also found on the upriver set of bollards on the levee side of the wharf. Nothing remained on the downriver set of bollards to which the stern lines had been led and the bollards were severely canted. These bollards were pulled up and the foundation logs below them were found to be badly deteriorated.

### XVI.

From the evidence adduced, we are convinced that the breaking adrift of the *American Oriole* resulted in part from the collapse or tearing away of a 42 foot section of wooden wharf to which the vessel had been moored. The set of double bitts to which the vessel's bow lines had been secured was missing completely and fresh damage was otherwise apparent. It is clear that the vessel strained on her lines in the gusting winds and when the mooring bitts were pulled into the river, the uneven strain on the spring lines caused them to part and the stern lines pulled over and off of the canted set of bollards to which they were secured.

### XVII.

We find no merit in Todd's contention that the breakaway resulted from a "force majeure", an unexpected storm bearing hurricane force winds. Plaintiff's expert

meteorologist, Albert Duckworth, testified unequivocally that the Todd Shipyard facility did not experience a tornado on January 10, 1975, conceding only the possibility of 50–60 mile per hour gusts in the area on that date. Weather reports from WWL–TV Station's weather recording equipment located about three miles NNW of Todd's Dock, recorded winds from 39 to 60 mph between 12:29 P.M. and 12:38 P.M. Weather equipment at the Naval Air Station, Alvin Callender Field, located about 8.4 miles SSE of the Todd facility, recorded winds of between 46 and 48 mph between 12:42 P.M. and 12:47 P.M. Photographs in evidence show that a large anchorage sign on posts just downstream from the Lower Navy Berth No. 4, and several toolsheds and a raised shed on Lower Navy Berth No. 4, suffered no discernable wind damage. The S/S *Galaxias,* moored about 200 feet above the *American Oriole* on the same dock, had no difficulty and did not break away from her moorings. There is no evidence to indicate that the winds actually experienced at Todd's Lower Navy Berth No. 4 were in excess of the winds recorded at WWL–TV Station and U. S. Naval Air Station. Plaintiff produced no evidence of any wind damage at or in the vicinity of Todd Shipyard, and there was no evidence of unusual wind damage in the New Orleans area on January 10, 1975.

## CONCLUSIONS OF LAW

### I.

The Court has jurisdiction of this matter and venue is proper.[1]

### II.

■ As a wharfinger entrusted with sole and exclusive custody and control of the unmanned, dead ship *American Oriole,* de-fendant, Todd Shipyard, was a bailee for hire.[2] Although not the insurer of a vessel so entrusted, defendant Todd Shipyard was under a duty to exercise reasonable diligence in ascertaining the condition of the vessel's berth and in properly and securely mooring her.[3]

### III.

■ Defendant Todd Shipyard breached that duty in failing to properly maintain the dock at Lower Navy Berth No. 4 and in failing to adequately secure the *American Oriole* in the face of impending bad weather.

### IV.

■ It is well settled that a vessel which drifts into collision is presumed to be at fault until the contrary is made to appear;[4] a breakaway such as the instant one establishes a prima facie case of negligence against the moving vessel.[5]

### V.

■ The evidence in this case, however, rebuts a presumption of fault on the part of the *American Oriole.* Her owners surrendered her to the care and custody of defendant Todd Shipyard fully one month prior to her breakaway and cannot be held responsible for Todd's failure to take adequate mooring precautions under the circumstances. It is uncontroverted that Todd was well aware of the severe weather forecast on the morning in question and nevertheless failed to discharge its duty to properly secure the vessel.

■ Accordingly, we find defendant, Todd Shipyard, as sole custodian of the vessel at the time of her breakaway, solely at fault in this casualty.

1. 28 U.S.C. 1333.

2. *Dow Chemical Co. v. Barge U M–23B,* 424 F.2d 307 (CA5-1970). The law of bailment is applicable in suits where, as here, a vessel is left in the custody of another for purposes of repair. See *Buntin v. Fletchas,* 257 F.2d 512 (CA5-1958).

3. *Dow Chemical Co. v. Barge U M–23B,* supra.

4. *The Louisiana,* 3 Wall. 164 (70 U.S.), 18 L.Ed. 85 (1865); *Wisconsin Barge Line, Inc. v. Barge Chem 301,* 390 F.Supp. 1388 (WD La.-1975).

5. *Monsanto Company v. Edwards Towing Corp.,* 318 F.Supp. 13 (ED Mo.-1969).

## VI.

Todd has failed to establish its defense of *vis major,* or Act of God. Although there is ample evidence that the Todd facility experienced substantial wind gusts contemporaneously with the breakaway, the weather on January 10 was not so catastrophic as to preclude effective precautionary measures in securing the *American Oriole.*

## VII.

Defendant Todd is liable to plaintiff as owner of the moored S/S *Locarno,* and to the intervenors as owners of the anchored M/A *Aino,* M/S *Danita,* M/S *Golden Chalice* and to Amstar Corporation for their provable damages, and to co-defendant American Foreign Steamship Corporation on its cross-claim for damages to the *American Oriole.*

## VIII.

Let judgment be entered accordingly.

## IX.

In the event provable collision damages cannot be established by compromise, determination of damages will be referred to a magistrate.