Jongsuk KIM, Yonho Seo, Myungran Kim, Dongwha Kim, Dongrim Kim, Dongsil Kim, Kyunghun Kim, Sunghun Kim, and Jongyun Kim, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 91 Civ. 1582 (LBS).

United States District Court, S.D. New York.

June 19, 1995.

Healy & Baillie, New York City (John C. Koster, Ronald Betancourt, of counsel), for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., Mary Jo White, U.S. Atty., Janis G. Schulmeisters, Atty. in Charge, Torts Branch, Civ. Div. U.S. Dept. of Justice, New York City (Jack S. Rockafellow, Arthur J. Gribbin, of counsel), for U.S.

SAND, District Judge.

This action is brought pursuant to the Public Vessels Act, 46 U.S.C.App. §§ 781–790, and the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–752, by the owners and operators of a fishing net located within plaintiffs' licensed fishing grounds in the vicinity of the town of Hwasan-ri, Republic of South Korea. Plaintiffs' claim is that during the course of joint American–South Korean amphibious military operations held in March, 1989 and named Team Spirit '89 ("TS–'89"), the U.S.S. Frederick, a Landing Ship Tank ("LST"), ran afoul of and caused considerable damage to plaintiffs' net. Plaintiffs' seek compensation for the cost of repairing the net and for lost income during the time the net was out of operation.

The action has been tried to the Court and the following constitutes our findings of fact and conclusions of law.

### Procedural History of Claim

TS–'89 was one of a series of annual military exercises jointly conducted by the American and Republic of South Korea ("ROK") forces since the 1970's. It was a massive undertaking involving 10–15 American and ROK ships, over 10,000 United States Marines, and 4–5,000 ROK Marines. TS–'89 was the subject of extensive planning and preparation. One aspect of this was the establishment of claims procedures for the processing of land and sea based civilian claims. Plaintiffs followed the prescribed procedures for the assertion of their claim and were advised that the United States had concluded that it was not liable for the damage to their net, on two grounds. First, "we are not convinced that the damage was caused by personnel of the United States Navy or by a United States Navy Ship." Second, plaintiffs had been "advised to remove or lower your nets for the duration of the exercise by officials of the Republic of Korea and that the location of your nets was not marked by lights or flares." Letter, Captain R.R. Rossi, Department of the Navy Office of the Judge Advocate General, Feb. 21, 1991 (Ex. 3).

The letter went on to advise plaintiffs that suits against the Navy based on maritime torts must be brought pursuant to the Public Vessels Act and that "the only proper forum for such a suit against the United States is United States Federal District Court." This is, of course, precisely the route taken by the plaintiffs.

With respect to the two grounds asserted by the Navy for the denial of the claim, the claim that the damage was not caused by the

United States Navy ship was contrary to the field observations made during the investigation of the claim and, although the failure to acknowledge that a Navy ship caused the damage persisted up until the eve of trial, defendant has now stipulated that plaintiffs' net was damaged when it became fouled in the running gear of the U.S.S. Frederick.

As to the second asserted grounds for denial of the claim, as we shall see below, it was simply not the case that plaintiffs had been advised by ROK officials or by anyone else to remove their net during the exercise, although it is true that plaintiffs' net was not illuminated.

Defendant urges throughout these proceedings the seeming incongruity and inappropriateness of a district court in New York adjudicating a net damage claim arising out of joint American–ROK military maneuvers in Korean waters. Defendant seeks to fault plaintiffs for this circumstance and for plaintiffs' failure to pursue claims against the Korean government. We believe whatever fault may lie for the failure to resolve this controversy by other means, it does not lie with the plaintiffs.

### Plaintiffs' Net

It is critical to an analysis of the issues presented herein that one appreciate the size and nature of the net in question. Plaintiffs' net was a seven chamber drift type net, 400 meters in length, 800 meters in circumference and 800 meters in width. Its top portion floated on the surface while its bottom portion was submerged to a maximum of 36 meters. The net was moored by over 100 anchors.

Two metal cylindrical buoys marked the net's northern and southern extremes, which were approximately 5 to 6 meters in length and 1.5 meters in diameter, floating approximately 1.0 meter above the water surface. The buoys were also marked with red and white pennants roughly 3.0 meters in height above the water surface. The net was also marked on the surface with 600 to 700 spherical glass and PVC floats and the floats also had flag markers.

The net had no form of illumination either by lights, chemicals or flares. During 1989, civilian vessels were barred from operating at night within three miles of the Korean coast pursuant to a government curfew (presumably adopted as a security measure against feared North Korean activity).

### Notice to Plaintiffs

There was a growing concern on the part of American military and naval forces with regard to the presence of fishing nets in the coastal areas where these annual exercises were conducted. With this in mind, planning conferences were held between American and ROK officials. At a conference held on January 25, 1989, the need to have fish nets removed from the exercise area was discussed. American representatives, mindful of the sovereign rights of South Korea, relied on the South Korean military authorities to implement the removal of nets which were in areas where the exercises would be conducted. The ROK officers were advised of the precise dates and locations in question. A document furnished to the ROK delineated the locations which included the area in which Plaintiffs' net was located.

ROK military officials have no authority to order civilian compliance with their directives. Civilian compliance is procured by means of a "request" and the local fishermen's associations are the means by which the Korean fishermen are apprised of what is required of them.

On March 7, 1989, Jongyun Kim ("Mr. Kim"), the general manager of Plaintiffs' fishing business, received Request for Cooperation Letter, reference No. 27722–83 (Exs. 18 and 19) to remove all net in an area "at sea off Dogseag-ri Dongramyeon" from March 8 to March 23, 1989. Attached to the letter was a chart. This letter and chart did *not* include the area of plaintiffs' net and plaintiffs disregarded the letter.

In fact, in previous years, Team Spirit exercises did not encompass the area of plaintiffs' net so that the description of the area of the exercise was not surprising. However, on March 7, 1989, Mr. Kim observed a large number of vessels offshore and, despite the absence of written notice to

704

do so, undertook to remove the plaintiffs' net. Bad weather prevented removal until March 10th, at which time one of the seven chambers of the net was removed.

Mr. Kim never received Request for Cooperation letter, reference No. 360–842 (Ex. U) which would have indicated that plaintiffs' net should be removed. Defendant's contrary claim that such notice was received by plaintiffs is not supported by the evidence or the investigations and testimony of Commander Doo Won Pang. Commander Pang, now Judge Advocate of the Korean Navy, was called by defendant and testified that his investigation revealed no documents which showed delivery to plaintiffs of documents advising removal of nets in plaintiffs' locations. (Tr. 262). He further testified that "... if the civil agency didn't send this message to the fishermen, then we can consider there was no order." (Tr. 260).[1]

Although both parties are in agreement that American maritime law is controlling here, inquiry was made of Commander Pang as to concepts of Korean law relevant to the reasonableness of plaintiffs' actions or omissions and the duty of care imposed on Korean fishermen. Commander Pang testified as follows:

THE COURT: Now suppose, hypothetically suppose the civilian authorities receive that document [Defendant's Exh. U] and do nothing. Does that itself create a legal obligation to the fishermen to remove the nets?

THE WITNESS: No. If they didn't send the message after receiving this, no. In other words, if the civil agency didn't send this message to the fisherman, then we can consider there was no order. (T. 260: 13–20).

\* \* \* \* \* \*

THE COURT: You're telling me ... that as long as the drift net is within the licensed area, and there is no legal obligation to remove it, that if the net is damaged by a Korean vessel, the net owner gets the full value of the damages?

THE WITNESS: Yes.

THE COURT: Regardless of the owner's awareness that there were going to be a lot of ships operating in the area?

THE WITNESS: Yes, yes. (T. 265:20–266:5).

Commander Pang also testified that a fisherman who is advised to lower or remove his net by the appropriate civilian authorities will receive compensation (in an amount not specified) for the loss of income. Mr. Kim's understanding was to the contrary.

*The Allision* *

*(a) Pre–Allision Events*

The U.S.S. Frederick is equipped with twin screws, controllable pitch propellers, large twin rudders and a bow thruster. It is a highly maneuverable vessel capable of stopping or turning 180 degrees within its own ship's length.

The Frederick was equipped with two independent surface search radars with three radar repeaters on the bridge and two in the

---

1. It is clear that prior to trial, defendant sought to elicit from Commander Pang an affirmative statement to the effect that notice was given to plaintiffs. In response, Commander Pang stated: "1. I have received your memorandum dated 20 April and reviewed documents related to T/S '89. I understand the precedential value of the case and would like to fully cooperate with your efforts. Unfortunately, I am not able to complete the affidavit requested by the United States Department of Justice to the ROK Marine Corps since I do not have either personal knowledge or sufficient documents to answer articles 3, 4, 5, 6 of the sample affidavit."

Memorandum for Commander, U.S. Naval Forces, Korea, 2 May 1994. Ex. 63(2)

The Affidavit in fact furnished by Commander Pang concluded: "5. Due to the distribution given to the Letter of Request, I believe the letter would reasonably have communicated notice of the arrival of the Team Spirit amphibious forces in the vicinity of Hwasan Ri to the fisherman of Hwasan Ri. However, I am not certain whether the contents of the Letter of Request were actually made known to the plaintiffs." Affidavit, Commander Pang, 13 May 1994 (Ex. 63(9)).

* An allision is a collision between a moving vessel and a stationary object. *Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1346 n. 1 (9th Cir.1985).

combat information center. On March 11, the radars and repeaters were on and functioning properly. During the time intervals in which the allision might have occurred, the ship was at general quarters with the consequence that all radar and lookout posts were fully manned. The Frederick had night vision devices on the bridge.

Although message traffic among higher naval commands (both American and ROK) indicated that there was an awareness of problems with nets during the several days preceding March 11, 1989, Captain Stephen Donlon, Commanding Officer of the Frederick, was not apprised of this. The information which he had been given at all times up to March 11th was that there would be no problem with nets.

In fact, an exchange of messages between the American and Korean naval commands reflects that the nets found to be in place on March 8th in the areas in which the exercises would be conducted *would be* removed. On March 8, according to the testimony of Colonel James A. Gillis, who was at the time the amphibious plans and operations officer, there were "lots of problems" concerning nets. Colonel Gillis testified that:

> The Navy guys were really up in arms. We kept assuring them, hey, look, the coordination has been made, the ROK marine Corps 1st Division has talked to the fishermen and maybe you did encounter a couple of nets, but don't worry about it because 8 March, they promised us 8 March till the end of the exercise the nets would be removed. (Tr. 470).

The American forces relied entirely on the assurances from the ROK officials as to future action that would be taken. They never sought nor received word from these officials that the nets had in fact been removed.

The American forces' reliance on the assurances that the nets would be removed had the consequence that no cautionary instructions went to Captain Donlon and his counterparts in the fleet and no surveillance, aerial or otherwise, was conducted as to removal of nets from the transit lines designated for TS–'89.

### (b) The Allision

On March 10, in the daylight hours of the morning, the Frederick practiced maneuvers, launching amphibious assault vehicles (AAVs), which landed on the shore, retrieving these vehicles and returning to sea.

During the night-time hours of March 10–11, the Frederick returned to the coastal area. The weather was clear with good visibility (meteorological visibility of at least 20 miles). The sea (swell and waves) was less than two feet. The Frederick had two U.S. Landing Platform Docks (LPDs) in formation astern and off-shore aft and made two passes at the shore to launch amphibious boats. The passes were made in pre-determined approach, launching and retirement lanes (Ex. 24(A)).

The first pass was made at 2:00 A.M. Four safety boats were launched after which the Frederick proceeded up the launch lane at a speed of 12 knots to the retirement lane and thence to sea to reposition itself for the second pass.

The safety boats were made of fiberglass and were 36 feet in length, 6 feet in beam, and had 3 to 4 feet of freeboard. For the next three hours, the Frederick was able to track on its radars the safety boats it had launched.

Neither visual nor radar sighting was made of the buoys and pennants marking plaintiffs' net and another net found within the transit lanes later that morning. Plaintiffs' net was within the designated retirement lane.

No abnormalities were discerned by Captain Donlon during the first pass or the passage out to sea.

The second pass began at 4:58 A.M. with the Frederick and the two LPDs in formation. At 5:44 A.M., the Frederick launched its AAVs and visually and by radar tracked them to the beach until they returned to the Frederick two hours later.

At 6:00 A.M., as daylight approached, the Frederick observed visually four buoys marking two fishing nets to the south, off the

Frederick's port side, the exact coordinates of which were recorded (Ex. 44).[2]

Although Captain Donlon's unrefreshed recollection was to the contrary, the Court finds that during the second pass, as well as the first, the Frederick transitted the predetermined retirement lane.

During the transit of the retirement lane on the second pass, the Frederick ran over plaintiffs' net which was located in the retirement lane (Ex. 24A). Captain Donlon became aware that the Frederick had fouled nets when the ship began to vibrate as it proceeded to sea.

As noted above, there is no longer any dispute that the Frederick in fact caused the damage to plaintiffs' net and that metal fragments recovered from plaintiffs' damaged net came from the Frederick.

### Radar and Night Vision Devices

A hotly disputed issue at the trial was whether nets marked by buoys and the other devices noted above were detectable by radar of the type on board the Frederick. Plaintiffs' expert witness, Jeffrey C. Flumignam, was unequivocal in his opinion (Tr. 139, 172) that the two buoys were detectable if wave heights were no more than 2 feet from a distance of 3–4 miles. Defendant contests this and Captain Donlon testified that despite careful monitoring of the radar screens by many persons, including himself, the nets were not detected.

Although it would appear to have been entirely feasible the next day or at any stage of the investigation of this claim to conduct tests to ascertain whether the radar could detect plaintiffs' nets—the nets were still in place, the LSTs or comparably equipped vessels were available, sea conditions were not unique—this was not done. This Court is therefore called upon to determine without the benefit of such testing whether the radar

would in fact have disclosed the presence of plaintiffs' net. In making this determination, we have considered all of the testimony, including the excerpts from Bowditch[3] relied upon by defendant concerning the difficulties in detecting smooth conical surfaces, and the photograph of the buoys. We find as a fact that plaintiffs' buoys and therefore the presence of the nets would be reflected on Frederick's radar.

What then explains the failure to detect plaintiffs' net since we know that the radar was fully operative and was able to track the AAVs to the beach and back? We think the answer lies in two factors. One, the Captain of the Frederick had not been made aware of the serious problems with regard to nets which were found to exist as late as March 8th. Having been assured there was no problem, the Frederick did not undertake a particular scrutiny of the radar screens for such objects.

Second, the overwhelming focus of attention was on the area between the launch site and the beach. It was this area where the AAVs were tracked and concerns for possible obstacles and the safety of the marines were paramount. The area in the retirement zone where plaintiffs' net was located was of far lesser concern and for that reason, we find there was a failure to detect the presence of the net, although it was detectable by radar.

The Frederick had night vision devices on the bridge. The Captain used them only briefly and instructed the lookouts not to use them. His testimony was that these devices were ineffective without some external light and that in any event, they impaired the lookouts' unaided night vision. In fact, the nearby beach where the landings occurred was well lit with spotlights to facilitate observation by the guest observers on the beach. Plaintiffs contend that the Frederick's failure to use all available lookout devices was a

2. Plaintiffs contend (Plaintiffs' Post–Trial Brief, pp. 7–8) that the fact that exact coordinates were furnished and that the Frederick was then stationary indicates that radar sightings of the nets were made. Captain Donlon testified somewhat inconsistently that he could not recall whether he

attempted to pick up the buoys by radar (T. 343) and that he did not do so (T. 355). We find that radar was utilized in plotting the exact location of these buoys.

3. American Practical Navigator, Bowditch, Volume I, pp. 993–995.

violation of Rule 5 of the Rules of the Road.[4] We find, however, that even if night vision devices had been used, the focus with such devices, as with the radar monitoring, would have been on the beach until the AAVs had been retrieved and that, under the conditions under which the Frederick believed it was operating (*i.e.* no net problems), the use of such devices during the retirement phase of the maneuvers was not mandated.

### Conclusions of Law

Plaintiffs contend that the Frederick is presumed to be negligent because it struck a stationary object, *see Compania de Navigacion v. S/S American Oriole,* 474 F.Supp. 22, 27 (E.D.La., 1976), *aff'd,* 585 F.2d 1326 (5th Cir.1978). *See also The Louisiana,* 70 U.S. (3 Wall.) 164, 18 L.Ed. 85 (1865); *Weyerhaeuser Co. v. Atropos Island,* 777 F.2d 1344, 1347 (9th Cir.1985). *James v. River Parishes Co., Inc.,* 686 F.2d 1129, 1131 (5th Cir. 1982); *Pasco Mktg., Inc. v. Taylor Towing Serv., Inc.,* 554 F.2d 808, 810 (8th Cir.1977). Defendant contends that such presumption, invoked in cases in which a clearly visible structure such as a bridge or dock is damaged, is not operative where the stationary object is submerged. Defendant asserts that it is entitled to claim the benefit of the paramount right of navigation. *See Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F.2d 1465, 1470 (5th Cir.1991); *Delta Transload, Inc. v. M/V Navios Commander,* 818 F.2d 445, 450 (5th Cir.1987).

■ We do not find it necessary or helpful to resort to presumptions or abstractions to resolve this controversy. First, plaintiffs' net was not an entirely submerged obstacle. As the testimony and photographs demonstrate, it had a significant above-surface presence. Second, defendant does not assert that the rules of engagement of TS–'89, its understanding with the Korean government or any other circumstance would have empowered the Frederick to run over plaintiffs'

net had it been aware of its presence (Tr. 14). The question then is whether the allision was the result of negligent acts of the defendant. We find that it was. It was negligent not to alert Captain Donlon to proceed with the precautions and safeguards which should have been followed if one were aware that there was no assurance that fishing nets, once present in the area, had in fact been removed. With or without such warning, the failure of the Frederick to detect the presence of plaintiffs' net was the result of the negligence of the Frederick.

It is of little moment whether the plaintiffs' assertion of negligence is expressed in a single cause of action predicated solely on the operation of the Frederick, or in two causes of action, in which the actions of the Frederick are viewed in the context of the acts and omissions of superior authorities, *e.g.,* the failure to conduct aerial surveillance to verify removal of the nets. Viewed either separately or in conjunction with each other, acts for which the defendant is responsible constituted negligence which caused the damage to plaintiffs' net.

■ Defendant asserts that plaintiffs were wholly or significantly responsible for the damage to their net. We reject this claim. Plaintiffs were under no legal obligation to take any action with respect to their net since no notice was given plaintiffs that nets in their location were to be removed. It was not negligent to fail to illuminate the nets since there was no reason to anticipate government vessels operating in that location and a curfew banned nighttime civilian vessels.[5]

Defendant's most strenuously asserted claim is that the cause of the allision was the failure of the Korean government to fulfill its obligations and commitment to cause plaintiffs' net to be removed. Thus, defendant asserts: "In the end, however, there can be little doubt but that the primary fault for Plaintiffs' damages must be attributed to the

---

**4.** Rule 5 reads: "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. § 1602, Rule 5.

**5.** Subsequent to TS–'89, fishing nets were illuminated during naval maneuvers. These post-accident remedial measures were of course not dispositive of the standard of care required of plaintiffs here.

Korean government for failure to disseminate timely and adequate notice to plaintiffs that their net must be removed for the exercise." Post–Trial Memorandum of Defendant United States, p. 2. Defendant contends that the government of South Korea, not the United States, should be liable for this damage. Defendant asserts this claim by several means.

■ First, defendant challenges the justiciability of this controversy, asserting that the case presents a political question relating to American–Republic of Korea relations. We disagree. No political question is presented by the circumstance of an American naval vessel damaging plaintiffs' property. Nor is any exception to the waiver of sovereign immunity for discretionary actions relevant here. It is only the defendant's claim that its reliance on the Korean government caused it to act as it did that presents any political overtones. But it should not be the responsibility of plaintiff-fishermen to resolve any question of inter-governmental relations.

■ Defendant's suggestion that this Court should allocate proportionate responsibility as among plaintiffs, the United States and South Korea is not appropriate. Plaintiffs' net was damaged by a United States vessel. Plaintiffs followed the prescribed claim procedure. For grounds which have either been abandoned or disproved, plaintiffs' claim was rejected by the Navy Department and plaintiffs were told to sue in this Court. If the United States believes that it has recourse against the Republic of Korea, it may, of course, pursue whatever avenues of redress it believes appropriate. It is unseemly to cast that burden on the plaintiff fishermen.

### Damages

Although damages are for the most part stipulated, two questions are at issue. What is the date upon which the conversion from Korean currency (won) to dollars takes place? For how many days should loss of profits be awarded?

■ The parties have stipulated that the cost of repair to the net was 83,251,550 won. Plaintiffs seek damages predicated on the

exchange rate on or about March 11, 1989 of 674.77 won per dollar in the amount of $123,-377.66. Defendant contends that the exchange rate on the date of the judgment should determine the amount of dollars awarded by the judgment.

Plaintiffs contend that the judgment-day rule applies when a tort occurs in a foreign country and is governed by foreign law (see, e.g., Conte v. Flota Mercante del Estado, 277 F.2d 664 (2d Cir.1960)) but if the right to recover is governed by American law, the applicable exchange rate is the prevailing rate on the date the cause of action arose, Shaw, Savill & Co. v. The Fredericksburg, 189 F.2d 952 (2d Cir.1951), and that this rule applies whether the tort occurs in United States waters or on the high seas.

In Conte v. Flota Mercante del Estado, Judge Friendly wrote:

> The Federal rule, Die Deutsche Bank Filiale Nurnberg v. Humphrey, 1926, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383, is that when an obligation is governed by foreign law, the conversion from the foreign currency into dollars is to be made at the rate of exchange prevailing at judgment. In Shaw, Savill, Albion & Co. v. The Fredericksburg, 2 Cir., 1951, 189 F.2d 952, 955, we applied that rule in admiralty to a collision in British territorial waters. In the Gylfe v. The Trujillo, 2 Cir., 1954, 209 F.2d 386, where there had been a collision between a Norwegian and a Panamanian ship on the high seas, we made the conversion as of the date of the accident; the rationale of the distinction was that the claim in The Gylfe arose under the general maritime law which was considered a part of the law of the forum and was thus created by American rather than foreign law. The rule of the Shaw case is applicable here since although the accident was at sea, liability is governed by Argentine law.

277 F.2d at 670.

Since American maritime law is controlling here, the applicable conversion rate is that on the date of the allision. We therefore award damages based on the exchange rate on March 11, 1989 (674.77 won per dollar), i.e., $123,377,66.

Lost profits have been stipulated to be 454,758 won per day for up to 69 days.

 Defendant contended at trial that plaintiffs would have sustained some loss of profits had the Frederick not damaged their net since Plaintiffs were in the process of voluntarily removing their net on March 10 and presumably would have continued to do so depending on weather conditions and the continuation of TS–'89 in that area. TS–'89 was to continue until March 23 and had plaintiffs received the correct documentation, they would have been instructed to remove nets until that date. As we have noted, the Korean Judge Advocate, Commander Pang, stated that a fishermen who removed nets pursuant to such a directive would be compensated for loss of profits, in an amount not stated, although Mr. Kim did not believe this would be the case. *See, supra,* p. 6.

We believe plaintiffs are entitled to lost profits for 57 days; 69 days for net repair, less 12 days (March 11–23) when nets would have been taken down even had there been no allision. At the exchange rate of 674.77 won per dollar, 454,758 won yields a rate of $670 a day for 57 days or a total of $38,190.

Interest will be allowed at the rate of 4% from the date of filing of the complaint, March 6, 1991. 46 U.S.C.App. § 745.

SO ORDERED.